**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**MARSHALL DIVISION**

| | |
|---|---|
| JOHN AMENT, ET AL, | |
| Plaintiffs, | **NOTICE OF REMOVAL** |
| vs. | Marion County Case No.  03-00108 |
| AMERICAN ELECTRIC POWER COMPANY, INC., ET AL, | |
| Defendants. | |

## I.    INTRODUCTION

Defendant ATK Aerospace Company, Inc. ("ATK") hereby gives notice of removal of *John Ament, et al v. American Electric Power Company, Inc. (AEP), et al*, Case No. 03-00108 (District Court, Marion County, Texas), to the United States District Court for the Eastern District of Texas, Marshall Division, pursuant to 28 U.S.C. §§ 1441, 1442 and Local Rule CV-81.

## II.    LOCAL RULE CV-81 INFORMATION

**Required Information.**  ATK provides the following information as required by Local Rule CV-81.  ATK has provided the Clerk with this Notice of Removal, a civil cover sheet, a certified copy of the state docket sheet and copies of all required state court filings (Exh. 3). Local Rule CV-81(c)(2).  ATK has also provided to the clerk a complete list of attorneys who have entered appearances.  Local Rule CV-82(c)(3).  Plaintiffs have requested a jury trial.  Local Rule CV-8(c)(4). The following parties are involved in this action, which is currently pending in

state court. Local Rule CV-81(c)(1). ATK provides this information in the format requested by the Clerk:

|  | PLAINTIFFS |  | DEFENDANTS |
|---|---|---|---|
| 1. | John Ament | 1. | American Electric Power Company, Inc. |
| 2. | Don Howell | 2. | American Electric Power Service Corporation |
| 3. | Ann Howell | 3. | Southwestern Electric Power Company |
| 4. | Chuck Ayers | 4. | Central and Southwest Services, L.P. (Del.) |
| 5. | Gary Kempf | 5. | Central and Southwest Services, L.P. (Tex.) |
| 6. | Henry Lewis | 6. | AEP Texas Central Company |
| 7. | Mary D. Lewis | 7. | Central and Southwest Corporation |
| 8. | Richard McFarland | 8. | Dolet Hills Lignite, Co. |
| 9. | Steven Parker | 9. | Texas Utilities Generating Company, Inc. |
| 10. | Michael Wayne Woodfin | 10. | Texas Generation Company, L.P. |
|  |  | 11. | TXU US Holding Company |
|  |  | 12. | TXU Generation Management Company, LLC |
|  |  | 13. | TXU Corp. |
|  |  | 14. | TXU Mining Company |
|  |  | 15. | TXU Business Services Company |
|  |  | 16. | TXU Mining Company, LP |
|  |  | 17. | TXU SEM Company |
|  |  | 18. | TXU Mining Management Company |
|  |  | 19. | ATK Aerospace Company, Inc. |
|  |  | 20. | Alliant Techsystems, Inc. |

**Timeliness.**   ATK was served with process and Plaintiffs' Original Petition (the "Petition") in this action on June 2, 2003, which was ATK's first receipt of the Petition. ATK is filing this Notice of Removal within thirty (30) days thereof, as required by 28 U.S.C. § 1446(b).

**Filing of Notice with State Court.** A copy of this Notice of Removal will this day be filed with the clerk of the District Court of Marion County, Texas and served upon Plaintiffs' counsel, as required by 28 U.S.C. § 1446(d).

## III.     GROUNDS FOR REMOVAL:

ATK relies on three independent grounds for removal: (a) "federal officer" removal under 28 U.S.C. § 1442, (b) "federal enclave" removal under U.S. Const. Art. I, Section 8, cl. 17 and 28 U.S.C. § 1441, and (c) pre-emption of the federal authority under Clean Water Act, as delegated to the State of Texas, see 63 Fed. Reg. 51,164 et seq. (Sept. 24, 1998), to establish discharge limits based on best available pollution control technology, and otherwise regulate discharges to Caddo Lake, under 28 U.S.C. § 1441.

### A.     Federal Officer Removal

ATK is entitled to remove pursuant to 28 U.S.C. § 1442(a)(1). This statute permits removal by the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office."

"Federal officer" removal is available when: (1) the defendant was acting under the direction of a federal officer, (2) the defendant is a "person" as envisioned by the statute, (3) there is a causal nexus between the plaintiff's claims and the acts performed under color of office, and (4) the defendant has a colorable federal defense to the plaintiff's claims.[1]  *Reed v. FINA Oil & Chemical Co.*, 995 F. Supp. 705, 710 (E.D. Tex. 1998) (citing *Mesa v. California*, 489 U.S. 121, 124-25, 128, 134-36 (1989)).

For the reasons set forth below, ATK meets each of these elements.

---

[1] Some courts have compressed these considerations into a three prong test, *see Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998), but they consider the same four questions. *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 659 n.7 (E.D. Texas 1999).

### 1.   **ATK Acted Under the Direction of a Federal Officer**

ATK's predecessor in interest, Thiokol Corporation ("Thiokol"), as a manufacturer performing sensitive military procurement and demilitarization contracts, acted under the direct control of a federal officer at all relevant times.

- The Longhorn Army Ammunition Plant (the "Longhorn Plant") was designed and built by the United States Army (the "Army"), and has remained in federal ownership since that time. Declaration of Thomas M. Aldredge ("Aldredge Decl.") ¶ 11 (Exh. 1). The Longhorn Plant is a government-owned, contractor-operated ("GOCO") facility. Id. ¶ 2. At all times, the federal government owned the real property, equipment, inventory, work in process and finished product at the Longhorn Plant. Id. ¶¶ 12-13.

- ATK's predecessor Thiokol operated the Longhorn Plant from 1952 to 1997. Id. ¶¶ 1, 7. Thiokol manufactured rocket components, flares and plastic explosives, and destroyed rockets and nuclear weapon components, pursuant to treaties between the United States and the former USSR. Id. ¶ 7. Essentially all this work was performed for Thiokol's sole customer and consumer of products from the Longhorn Plant – the Army. Id. ¶ 8.

- The Army maintained civilian and uniformed personnel to oversee, direct and control every aspect of Thiokol's activities. Id. ¶¶ 14-16. These personnel reported directly to the Plant Commander, a U.S. Army Lt. Colonel. The Plant Commander, in turn, reported to the Armament Munitions and Chemical Command ("AMCCom") at Rock Island, Illinois. The Longhorn Plant received orders and communications from AMCCom via a direct teletype connection.

Further, the Army's control was pervasive and extremely detailed:

- The Army designed all the products manufactured at the Longhorn Plant and issued Thiokol detailed design specifications, standards and procedures, thereby controlling every aspect of Thiokol's production activities at the Longhorn Plant. Id. ¶¶ 8, 17-20. Thiokol was not permitted to deviate from these specifications. Id. ¶ 17.

- The Army dictated how many employees Thiokol could hire, the salaries of its employees, and the tasks they could perform. Id. ¶ 10.

- Army personnel dictated procedures for handling hazardous substances, as well as the waste disposal methods and activities at the Longhorn Plant. Id. ¶¶ 21-25. The Army conducted environmental studies to ensure that its operations and waste disposal activities would not adversely impact public health and the environment. Id. ¶¶ 25-27.

- Thiokol, regulatory agencies and the public relied upon environmental studies prepared by the Army and assurances made by the Army regarding the safety and environmentally protectiveness of activities at the Longhorn Plant. Id.

2.   **ATK is a "Person" Under the Statute.**

Corporate entities are considered "persons" within the meaning of § 1442(a)(1). *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). ATK is a Delaware Corporation. *See* Aldredge Decl. ¶ 1. As such, ATK is a "person" and meets the second element of the "federal officer" removal test.

3.   **A Causal Nexus Exists Between Plaintiffs' Claims and the Acts Performed under Color of Office**

Plaintiffs' claims appear to arise from alleged releases of hazardous substances (mercury and apparently other unidentified substances) from operations and waste disposal activities. In the event that any such releases occurred at the Longhorn Plant (which ATK denies but assumes *per arguendo*), such releases were directed by and the sole responsibility of the Army. In other words, given that the federal government dictated the precise manner in which ATK produced products, handled hazardous substances, and performed waste disposal activities, *supra* pp. 4-5, any release which allegedly injured Plaintiffs "was a direct result of the actions taken under the direction of a federal officer." *Reed*, 995 F. Supp. at 712.

4.   **ATK Has Colorable Federal Defenses**

ATK raises at least three colorable federal defenses to Plaintiffs' claims.

a.   **Government Contractor Defense**

ATK asserts the "government contractor" defense as to Plaintiffs' negligence and strict liability claims. *See Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988); *Winters,* 149 F.3d at 396-401. This defense is available when three elements are met: (1) the United States approved reasonably precise specifications, (2) the product conformed to the specifications, and (3) the defendant warned the United States about any dangers from the product that were known to the defendant but not to the United States. *Boyle*, 487 U.S. at 512.

The United States not only approved the specifications for products produced at the Longhorn Plant, it *wrote* them and had complete and pervasive ownership and control over every activity at the Longhorn Plant. *Supra* pp. 4-5. The specifications were extremely detailed and precise.    Aldredge Decl. ¶ 17.    Thiokol remained in material compliance with these specifications and other contract requirements. Id. ¶ 14. Finally, Thiokol (as wells as regulatory agencies and the public) relied on Army environmental studies and assurances that no defects or risks arose from the operations and waste disposal activities at the Longhorn Plant. Id. ¶¶ 25-27.

b.    **Defense Production Act Defense**

ATK contends that it is immune from this suit pursuant to the Defense Production Act ("DPA"). 50 U.S.C. §§ 2061 *et seq.* The DPA prohibits any person from being "held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued" pursuant to the DPA. *50 U.S.C. § 2157.*

In connection with the allegations raised in the Petition, ATK's predecessor, Thiokol, was complying with orders issued pursuant to the DPA. The contracts under which Thiokol operated the plant were all "rated orders." Aldredge Decl. ¶ 9. "Rated orders" are contracts which the government has determined are needed to promote the national defense in accordance with the DPA. 15 C.F.R. Part 350 *et seq.*

c.    **CERCLA § 113(h) Defense**

ATK asserts that this court lacks subject matter jurisdiction over Plaintiffs' claims. Section 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(h), divests federal courts of jurisdiction to "review any challenges" to ongoing "removal or remedial" actions performed under CERCLA.    The Longhorn Plant is currently subject to active CERCLA remedial investigations and remedial

actions.[2]   "[N]early every court to address the scope of Section 113(h) has concluded that litigation which interferes with even the most tangential aspects of a cleanup action is prohibited."   *Oil, Chemical & Atomic Workers International Union (OCAW) v. Pena*, 62 F.Supp.2d 1, 3-4 (D.D.C. 1999), *aff'd* 214 F.3d 1379 (D.C. Cir. 2000).

Plaintiffs' prayer for relief requests, among other things, an order "requiring defendants to implement the best available pollution control technology."   Petition at ¶ 40.   Plaintiffs' challenge to the technology and methods used to abate and remedy conditions in and adjacent to the Longhorn Plant in conjunction with the current CERCLA cleanup activities underway at that facility is precisely the sort of interference with agency discretion that CERCLA § 113(h) was designed to bar.   The CERCLA activities preempt state law and present a federal question.

## B.   Federal Enclave Jurisdiction

ATK is also entitled to remove pursuant to the federal enclave clause of the U.S. Constitution.   U.S. Const. Art. I, § 8, cl. 1 (granting Congress power to exercise exclusive legislation "over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings").   This clause renders state tort claims arising from federal enclaves a matter of federal law.   *Mater v. Holley*, 200 F.2d. 123 (5th Cir. 1952).   The Longhorn Plant is a federal enclave.   Aldredge Decl. ¶ 2; *see, also, McCormick v. C.E. Thurston & Sons, Inc.*, 977 F.Supp. 400, 402 (E.D.Va. 1997) (noting that lands purchased by the federal government in the manner

---

[2]   Congress enacted CERCLA in 1986 to protect the public health and environment from exposure to hazardous substances. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986). EPA commenced a Remedial Investigation and Feasibility Study ("RI/FS") in August 1982. EPA Region 6, *Longhorn Army Ammunition Plant Texas, EPA ID# TX6213820529* (Apr. 3, 2003) (Exh. 2). The Longhorn Plant was added to the CERCLA National Priorities List ("NPL") in August 1990. Since that time, the Army has taken responsibility for all remedial activities under the direction of EPA Region 6 and the Texas Natural Resource Conservation Commission. Id. EPA has concluded that the "Longhorn Army Ammunition Plant Site currently does not present an immediate threat to the public or the environment." Id. at 4. EPA also has indicated that "[a]s studies are completed and viable cleanup alternatives are determined for the sites, final remedies will be selected, and the cleanup activities will begin." Id.

outlined in the enclave clause are deemed federal enclaves). Accordingly, plaintiffs' claims create a federal question over which this court has jurisdiction. 28 U.S.C. §§ 1441(b), 1331.

**C.  Delegated Clean Water Act Authority Governing Discharges to Caddo Lake**

Plaintiffs seek an order "requiring defendants to implement the best available pollution control technology reasonable [sic] designed to reduce risks to the plaintiffs." Plaintiffs' Petition ¶ 40. Federal authority under the Clean Water Act, see Clean Water Act § 402, 33 U.S.C. § 1342, as delegated to the State of Texas, see 63 Fed. Reg. 51,164 et seq. (Sept. 24, 1998), preempts state common law claims to establish discharge limits based on best available pollution control technology, or to otherwise regulate discharges to and contamination in Caddo Lake, and presents a federal question. 28 U.S.C. §§ 1441(b), 1331.

**IV.  CONCLUSION**

WHEREFORE, Defendant ATK respectfully files this Notice of Removal.

Respectfully submitted,

Respectfully submitted,

BY: _____
Otis Carroll
State Bar No. 03895700
Collin Maloney
State Bar No. 00794219

IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Tel: (903) 561-1600
Fax: (903) 581-1071

Lawrence E. Stevens
Michael Larsen
PARSONS, BEHLE & LATIMER
One Utah Center
201 S. Main Street, Suite 1800
P. O. Box 45898
Salt Lake City, Utah 84145-0698
Tel: (801) 532-1284
Fax: (801) 536-6111

ATTORNEYS FOR DEFENDANTS
ATK AEROSPACE COMPANY, INC.
AND ALLIANT TECHSYSTEMS, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Notice of Removal has been forwarded, via facsimile and/or regular mail, with proper postage affixed, to the following counsel of record this the _2nd_ day of July, 2003:

John D. Sloan, Jr.
Laureen F. Bagley
Sloan & Monsour, P.C.
101 E. Whatley Street
Longview, TX 75601

Mark R. Mueller
Kathleen P. McCartan
Mueller Law Offices
404 West 7th Street
Austin, TX 78701

Collin Maloney

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### MARSHALL DIVISION

| | |
|---|---|
| JOHN AMENT, ET AL, <br><br> Plaintiffs, <br><br> vs. <br><br> AMERICAN ELECTRIC POWER COMPANY, INC. <br><br> Defendants. | **DECLARATION OF THOMAS M. ALDREDGE** <br><br> Case No. 03-00108 |

I, Thomas M. Aldredge, being under penalty of perjury, declare and say based on personal knowledge:

1.      I am a Contract Specialist and Accounting Facilitator for ATK Thiokol Propulsion, a division of ATK Aerospace Company Inc., an affiliate of Alliant Techsystems Inc., located in Brigham City, Utah, and successor-in-interest to Thiokol Propulsion, a division of Cordant Technologies, Inc. ("Thiokol"). ATK is incorporated in the State of Delaware.

2.      My current responsibilities include contract administration for all Domestic Demilitarization, Ordnance and Tactical Weapons Systems, as well as all interdivisional contracting with the other ATK companies. I have the additional responsibility for all of the former Thiokol contracts associated with the Longhorn Army Ammunition Plant (the "Longhorn Plant") and the Louisiana Army Ammunition Plant (the "Louisiana Plant"). The

537821.1

Longhorn Plant was a 8,493 acre government-owned, contractor-operated ("GOCO") facility in Karnack, Harrison County, Texas.

3.     From April 1979 until June 1991, I worked as an accountant in various positions in "Finance and Administration" organizations of Thiokol at the Louisiana Plant.  In July 1991, Thiokol consolidated the "Finance and Administration" functions of both the Longhorn Plant and the Louisiana Plant into a single operational entity.  Upon consolidation, I held various supervisory positions within the consolidated "Finance and Administration" operational entity concerning both the Longhorn Plant and the Louisiana Plant.

4.     My major areas of responsibility while working in the consolidated "Finance and Administration" operational entity included preparing and submitting to the Army a variety of cost accounting and government procurement documentation (such as Cost Accounting Standard ("CAS") Disclosure Statements to the Army, incurred cost submissions and indirect rate submissions, public voucher and similar requests for reimbursement, and contract funding); acting as liaison to the Defense Contract Audit Agency ("DCAA") in connection with audits and issues coordination, and; acting as the interface with the U.S. Army ("Army") procurement contracting officer ("PCO") and administrative contracting officer ("ACO").

5.     In August 1998, I was transferred to Thiokol's facility in Utah, where I have continued to support all of Thiokol's financial and contractual responsibilities for the Longhorn Plant and the Louisiana Plant.

6.     During my involvement with the Longhorn Plant, I worked closely with Thiokol's contract managers.  I became familiar with the nature and extent of oversight and control the government exercised over Thiokol in its performance of the contracts at the

Longhorn Plant. I also had frequent communication with Army personnel responsible for overseeing Thiokol's work.

7.     Longhorn Plant Products. Operations at the Longhorn Plant commenced in 1942 by other government contractors to produce the explosive 2,4,6-trinitrotoluene ("TNT"). Thiokol operated the Longhorn Plant for more than 45 years (from 1952 to 1997) through a series of contracts with the Army. The activities performed by Thiokol at the Longhorn Plant included the manufacture of a variety of handheld signals (i.e., flares), various rocket components and plastic explosives; demilitarization (i.e., decommissioning of weaponry through destruction and disposal) of various weapons; and performance of certain research and development activities. If during the period of contract performance the Army concluded that it no longer needed a product, the Army directed Thiokol to cease making the product. All work Thiokol performed at the Longhorn Plant was for the Army (with the exception of a comparatively small number of handheld signals sold to commercial airlines and similar customers with permission from the Army).

8.     All the products manufactured by Thiokol for the Army at the Longhorn Plant were designed by the Army or by other Army contractors. Thiokol did not design products or manufacture products based on performance specifications. Rather, Thiokol manufactured products based on detailed design specifications provided by the Army. From time to time the Army contracted with Thiokol to make improvements to design specifications through research and development ("R&D") projects. However, this constituted a small part of Thiokol's business and any such R&D projects were performed under the control and direction of Army technical personnel.

9.    Rated Contracts. Each contract Thiokol had with the Army was issued as a

"rated order" pursuant to the Defense Production Act.  A contract's status as a rated order

typically is indicated by the Government's assignment of a priority rating which, in the case of

Thiokol's contracts for the Longhorn Plant, was typically "DO-A6." The signature pages to the

contracts with the Army indicate the assignment of the rating. See, e.g., Contract, Box 4 (May

1, 1971) (Attachment A).

10.    Cost Reimbursement Contracts. Most of the contracts between the Army and

Thiokol were cost reimbursement contracts – either "cost plus fixed fee" or "cost plus award

fee" contracts.  For both contracts, Thiokol prepared in advance of contract performance an

estimated cost base ("ECB") – a detailed list of anticipated costs of performing the contract to

be passed through to the Army.  The ECB included a list of personnel by job description and

salaries, as well as detailed tasks required and approved by the Army.  During performance of

the contract, Thiokol was only reimbursed for "allowable" costs supported by detailed monthly

invoices which included references to "contract line item numbers" or "CLINs" to demonstrate

that the costs reflected the performance of approved tasks by approved personnel at the

approved compensation levels.  Thiokol was not allowed to hire additional personnel, pay

different salaries or perform different tasks other than those agreed to by the Army.  During the

1990s, Thiokol was required to obtain Army approval prior to purchases of equipment and

commodities in excess of $5,000.  The approval amount was lower in Thiokol's earlier tenure

at the Longhorn Plant.

11.    Army Ownership of the Longhorn Plant and Equipment. At all times, the Army

owned the real and personal property located at the Longhorn Plant.  At the time Thiokol first

commenced performing government contracts at the Longhorn Plant, the Army had already constructed buildings and production lines. Thiokol undertook few if any projects to design and construct buildings and equipment at the Longhorn Plant. While Thiokol built a firehouse at the Longhorn Plant and may have made modifications to existing buildings, it subcontracted out the actual design and construction work – all of which was performed under the direction and control of Army personnel. Thiokol owned little if any property at the Longhorn Plant (although I am aware that Thiokol owned one automobile and an army surplus computer system).

12. <u>Ownership of Raw Materials and Work in Process.</u> The government furnished to Thiokol much of the raw materials and components used by Thiokol. These "government furnished materials" were often manufactured by other government contractors. Whether or not the raw materials were furnished by the Army or independently obtained by Thiokol from suppliers, the Army owned the inventory of raw materials and components. The Army also owned the work in progress.

13. <u>Transportation.</u> After the Army inspected and accepted the finished product, it determined the mode of transportation and arranged for transportation of the finished product either by military or commercial transport.

14. <u>Pervasive Army Oversight and Control.</u> During the course of its operations, Thiokol was subject to the direction of the Secretary of Defense, the Secretary of the Army, and numerous military officers and Army civilian personnel assigned by the Army to command the Longhorn Plant. Numerous Army officials routinely issued orders, directions and specifications governing virtually every aspect of the operation and management of the

Longhorn Plant. At all relevant times Thiokol remained in material compliance with all such contract obligations.

15.     The Army controlled extensively, through its contracts and through direction by the Army personnel, the products to be produced by Thiokol at the Longhorn Plant, the materials and procedures to be used in the manufacture of those products and the training and safety measures employed by Thiokol at the Longhorn Plant. While the precise methods of the Army's control varied somewhat over time depending on the precise activity, the fact of the control and its extensive nature remained consistent.

16.     In addition to the oversight and control provided by federal officers whose offices were physically located at other Army facilities, the Army maintained a contingent of military officers and civilian government employees on site at the Longhorn Plant to manage and oversee Thiokol's activities there. During my employment at the Longhorn Plant the number of military and civilian government employees assigned on-site was upwards of 30. The Government's on-site staff included personnel responsible for managing quality, safety and environmental matters, engineering, and government contracting activities, among others.

17.     The Army issued detailed "standing operating procedures" ("SOP") to Thiokol. Army contracts with Thiokol for operation of the Longhorn Plant required that Thiokol conduct its Longhorn Plant operations pursuant to government-approved SOPs. Thiokol was not allowed to deviate from an SOP without obtaining Government approval for the change.

18.     In addition to these SOP requirements, the Government established an extensive set of military specifications applicable to the products, materials, and processes at the Longhorn Plant, which were invoked under the Longhorn Plant contracts. These specifications

extensively addressed such details as the composition of materials, testing requirements, packing and shipping instructions, and marking requirements. Thiokol was obligated by the Longhorn Plant contracts to comply with the direction set forth in those specifications. Unlike most commercial contracts, the Army contracts gave to the Army the unilateral right to order changes both to the products manufactured by Thiokol and to the specifications I described above. Thiokol was obligated to perform the changes pursuant to the Army's direction.

19.     The Army required that Thiokol develop and receive approvals for "department procedures" which implemented military standards and SOPs. For example, the Army requested that Thiokol develop a departmental procedure in the mid-1980s governing "mercury handling, spills and cleanups," which the government approved with a modification to provide notice to the Army's "Environmental Coordinator COR Staff" in the event of "a release/spill of mercury...." See Departmental Procedure No. 420-4-3 (Feb. 19, 1985) (Attachment B).

20.     Various military commands routinely issued manuals, handbooks and precise specifications governing operations and disposal activities. For example, the Army furnished numerous "Engineering Design Handbooks" governing virtually every conceivable operation and activity at the Longhorn Plant and other GOCO facilities. A list of these handbooks in effect in 1971 is attached. See Engineering Design Handbooks (Attachment C). In addition, the government supplied manuals and design specifications governing the design and operation of wastewater treatment plants, see Maintenance and Operation of Water Supply, Treatment, and Distribution Systems (Aug. 30, 1984) (Attachment D). In addition, the Army directed and approved design of the systems managing wastewater, including the sumps, conveyance and discharge systems.

21.     It is difficult to overemphasize the amount of control the government exercised over all activities at the Longhorn Plant, including waste disposal. I will provide a few examples of documentary evidence that illustrate the complete control the Army exercised during Thiokol's involvement at that installation.

22.     In the late 1970s, the Army Armament Materiel Readiness Command in Rock Island, Illinois decided that even though Texas environmental regulators had requested that the Army construct an incinerator to dispose of "explosive waste" at the Longhorn Plant, the Army directed that Thiokol dispose of such waste through "open burning." See Teletype Communication (Oct. 15, 1979) (Attachment E).

23.     While I do not know what precise activities at the Longhorn Plant the plaintiffs in this case allege resulted in contamination of Caddo Lake, I note that some have asserted that certain activities at the Longhorn Plant allegedly have resulted in contamination to surface water and/or groundwater. I am somewhat familiar with these allegations because I have had responsibility for claims chargeable to the Army regarding environmental costs associated with Thiokol's activities at the Longhorn Plant, including prior toxic tort litigation and remedial efforts.

24.     An example of a major project performed at the Longhorn Plant includes the "demilitarization" of the Pershing missiles from 1988 to 1991 through the static burning of rocket motors. This project was performed pursuant to the Intermediate Range Nuclear Forces Treaty between the United States and the USSR as part of the government's elimination of a portion of its nuclear weapons stockpile. The Army provided detailed SOPs governing every aspect of this project. Like other projects, the Army took full responsibility for determining the

safety and environmental impacts. Specifically, after the Pershing missile rocket motor demilitarization campaign, and before a new campaign involving the static firing of 2,000 motors for the high velocity aerial rocket (the "HVAR MX 10") and 114 "Sparrow" rocket motors, the Army engaged an environmental engineering firm (i.e., Ebasco Environmental, Inc.) to conduct an environmental study to determine whether "contamination of Caddo Lake or the surrounding atmosphere occurred from the static firing of Pershing rocket motors." The Army and its environmental consultant debriefed Thiokol personnel in 1994, informing them: "An environmental evaluation performed in September 1991 by Ebasco Environmental, Inc. subsequent to the demilitarization of the Pershing rocket motors included data which conclusively indicated that no contamination of Caddo Lake or the surrounding atmosphere occurred from the static firing of the motors." See Meeting Agenda and Debriefing Materials (undated) (Attachment F). Based on the Army's conclusions that the static firing was a safe disposal option for rocket motors, the Army issued rated orders to Thiokol for the demilitarization of the HVAR MX 10.

25.     In July 1991, the U.S. Army Armament Munitions and Chemical Command issued a detailed "description of operation" to the Commander of the Longhorn Plant which specified the precise method and even the number of operators Thiokol would use for the demilitarization of the HVAR MX 10 and Sparrow rockets. See Memorandum from Contracting Officer, Headquarters, U.S. Army Armament, Munitions and Chemical Command to Commander, Longhorn Army Ammunition Plant (Jul. 24, 1991) (Attachment G). Thiokol relied on the Army's environmental studies regarding the public safety and environmental protectiveness of the Army's procedures governing this campaign.

26.     Thiokol was not the only entity to rely on the Army's environmental studies and procedures governing the destruction of rocket motors. The state regulatory authority – the Texas Natural Resource Conservation Commission ("TNRCC") – acknowledged the Army's control and responsibility for the environmental studies and operating parameters governing Longhorn Plant operations and disposal activities. On June 22, 1994, TNRCC's Industrial and Hazardous Waste Division informed Lieutenant Colonel Lawrence J. Sowa (a member of the command chain of the Longhorn Plant) that he should assign personnel to attend a public hearing on behalf of the Army "to explain the proposed activity and its potential impact on the environment. The public will then be allowed to ask questions and express concerns." See Letter from Charles E. Mauk, Industrial and Hazardous Waste Division, TNRCC, to Lt. Col. Lawrence J. Sowa, Longhorn Army Ammunition Plant (Jun. 22, 1994) (Attachment H).

27.     Similarly, TNRCC issued permits to the Army for activities resulting in wastewater discharges to Caddo Lake. See NPDES Permit (Aug. 20, 1993) ("U.S. Department of Army ... is authorized to treat and dispose of wastes from the Longhorn Army Ammunition Plant ... located adjacent to Caddo Lake ... to an unnamed tributary (locally known as North Bayou); thence to Goose Prairie; thence into Caddo Lake") (Attachment I).

28.     Many other examples of the Army's complete ownership and control over Thiokol's activities at the Longhorn Plant could be cited with supporting documentation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⎯2nd⎯day of July, 2003.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Thomas M. Aldredge

# ATTACHMENT A

| DARD FORM 26. JULY 1966<br>ERAL SERVICES ADMINISTRATION<br>PROC. REG. (41CFR) 1 16.101. | **PART I – S____ __N A**<br>**AWARD/CONTRACT** | | | PAGE<br>1 | OF<br>115 |
|---|---|---|---|---|---|
| RACT (Proc. Inst. Ident.) NO<br>- 71-C-0265   CODE | 2 EFFECTIVE DATE<br>71MAY01 | 3. REQUISITION/PURCHASE REQUEST/PROJECT NO. | 4. CERTIFIED FOR NATIONAL DEFENSE UNDER BDSA<br>REG 2 AND/OR DMS REG. 1.<br>RATING: | | DO–A6 |



1

5.
A52898

o ____ent of the Army
unition Procurement & Supply Agency
iet, Illinois   60436

6. ADMINISTERED BY (If other than block 5)   CODE  A52898

7. DELIVERY
☐ FOB DESTI-NATION
☐ OTHER (See below)

CTOR   CODE   029775
AND ADDRESS

    Thiokol Chemical Corporation
    Bristol, Pennsylvania 19007

FACILITY CODE   06B123

9. DISCOUNT FOR PROMPT PAYMENT

            None

O/MARK FOR   CODE

e furnished at a later date.

10. SUBMIT INVOICES _____ to
DCAA Resident Auditor
Longhorn AAP   CODE  A52ATH

12. PAYMENT WILL BE MADE BY

Finance & Accounting Officer
Ammunition Procurement and Supply Agency
Joliet, Illinois   60436

ROCUREMENT WAS  ☐ ADVERTISED.  ☒ NEGOTIATED, PURSUANT TO:  ☒ 10 U.S.C. 2304 (a)( 16 )
                                                            ☐ 41 U.S.C. 252 (a)(  )

TING AND APPROPRIATION DATA

ection K

## TABLE OF CONTENTS
*The following checked sections are contained in the contract*

| PART I—GENERAL INSTRUCTIONS | Page | (X) | Sec. | | Page |
|---|---|---|---|---|---|
| Cover Sheet & Preamble | 1-4 | | G | Preservation/Packaging/Packing | |
| Contract Form and Representations, Certifications, and Other Statements of Offeror | | | H | Deliveries or Performance | |
| | | | I | Inspection and Acceptance | |
| Instructions, Conditions, and Notices to Offerors. | | X | J | Special Provisions | 24-35 |
| | | X | K | Contract Administration Data/Cost Provisions | 36-48 |
| Evaluation and Award Factors | | | | **PART III—GENERAL PROVISIONS** | |
| PART II—THE SCHEDULE | | X | L | General Provisions | 49-11 |
| Supplies/Services and Prices | 5-23 | | | **PART IV—LIST OF DOCUMENTS AND ATTACHMENTS** | |
| Description/Specifications | | X | M | List of Documents and Attachments | 115 |

TOTAL AMOUNT OF CONTRACT  $ 14,893,796.09

## CONTRACTING OFFICER WILL COMPLETE BLOCK 22 OR 26 AS APPLICABLE

TRACTOR'S NEGOTIATED AGREEMENT. (Contractor is required to sign
___ and return _____3_____ copies to issuing office.) Contractor agrees
_____ and deliver all items or perform all the services set forth or otherwise
_____ and on any continuation sheets for the consideration stated herein.
_____ and obligations of the parties to this contract shall be subject to and
___ by the following documents: (a) this award/contract, (b) the solicitation,
___ (c) such provisions, representations, certifications, and specifications,
_____ched or incorporated by reference herein. (Attachments are listed herein.)

26. ☐ AWARD (Contractor is not required to sign this document.) Your offer on
Solicitation Number _____, including the
additions or changes made by you which additions or changes are set forth in full
above, is hereby accepted as to the items listed above and on any continuation
sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

THIOKOL CHEMICAL CORP.

BY ___ J. Cannon Jr ___

27. UNITED STATES OF AMERICA
BY ___(signature)___
(Signature of Contracting Officer)

TITLE OF SIGNER (Type or print)
__ J. CANNON, Jr
ROSPACE N_____

28. DATE SIGNED
Sep. 30

29. NAME OF CONTRACTING OFFICER (Type or print)
LOUIS SIRT

30. DATE SIGNED

# ATTACHMENT B

**MORTON THIOKOL, INC.**
Longhorn Division

# DEPARTMENTAL PROCEDURE

SUBJECT

Mercury Handling, Spills and Cleanup

PROCEDURE NO: 420-4-3

PAGE 1 OF 2

ISSUED 2/19/85

SUPERSEDES

PURPOSE: To provide procedures for the proper handling of mercury in order to prevent spills.  To provide guidance for actions should a spill occur and to provide procedures to be followed during and after cleanup operations.

SCOPE: The instrument shop has primary responsibility for handling mercury. Other crafts who must work around or with devices (manometers, etc.) containing mercury will contact the instrument shop to insure that their actions do not result in a release of mercury to the environment (spills).

PROCEDURE:

1. Mercury devices will be serviced, handled, inspected or deactivated by qualified personnel only.  Devices attached to equipment should be drained or plugged before the equipment is moved to prevent spills.

2. Should a release/spill of mercury occur, all operations will stop until the mercury is recovered.  Action should be taken immediately to:

   a. Contain the release/spill to the smallest area possible.

   b. Contact the environmental office to affect cleanup as soon as possible.

   c. Restrict access to the contaminated area until cleanup actions are completed.

   d. Work with environmental personnel and instrument personnel to cleanup all evidence of mercury.

3. When called, two instrument shop personnel will go to the spill site with all required equipment to effectively cleanup the spill.  This equipment will include:

   a. Mercury vacuum cleaner

   b. "Hg X" powder

   c. Broom and dust pan

   d. Protective clothing to include:

      (1) Rubber gloves (Latex)

      (2) Rubber boots

      (3) Mercury respirators (3-M Disposable)

      (4) Disposable coveralls

**MORTON THIOKOL, INC.**
Longhorn Division

# DEPARTMENTAL PROCEDURE

PROCEDURE NO. 420-4-3

PAGE 2 OF 2

ISSUED 2/19/85

SUBJECT
Mercury Handling, Spills and Cleanup

SUPERSEDES

4. Working with environmental personnel, the instrument personnel will develop a plan to effectively cleanup the mercury without exposure of personnel to health hazards associated with mercury.

5. Following cleanup operations, the instrument personnel will store the mercury residue pending reclaiming or disposal in sealed plastic containers, which will be stored in the mercury cabinet located in the instrument shop.

Leo Long
Operations Director

5 March, 1985

TO:  Carlos Benge

From:
Contract Administration

SUBJECT:  Thiokol Departmental Procedure No. 420-4-3 Mercury
          Handling, Spills and Cleanup

It is recommended that the following statement be added to
paragraph 2.  "Contact the Installation's Environmental
Coordinator COR Staff".  This should be placed in the appropriate
position of importance within the stated paragraph.

Response other than necessary action is not required.

GORDON O. PETERSEN
Chief, Contract Administration
Division

Ed Brosch:

your action. you may want to
review the total procedure.

3/8/5

# ATTACHMENT C

# ENGINEERING DESIGN HANDBOOKS

Listed below are the Handbooks which have been published or are currently under preparation. Handbooks with publication dates prior to 1 August 1962 were published as 20-series Ordnance Corps Pamphlets.   AMC Circular 310-38, 19 July 1963, redesignated those publications as 706-series AMC Pamphlets (e.g., ORDP 20-138 was redesignated AMCP 706-138). All new, reprinted, or revised Handbooks are being published as 706-series AMC Pamphlets.

<table>
<tr><td colspan="2"><b>No.</b><br>AMCP 706-</td><td><b>Title</b></td><td colspan="2"><b>No.</b><br>AMCP 706-</td><td><b>Title</b></td></tr>
<tr><td>100</td><td colspan="2">Design Guidance for Producibility</td><td>201</td><td colspan="2">*Rotorcraft Engineering, Part One, Preliminary Design</td></tr>
<tr><td>104</td><td colspan="2">Value Engineering</td><td>202</td><td colspan="2">*Rotorcraft Engineering, Part Two, Detail</td></tr>
<tr><td>106</td><td colspan="2">Elements of Armament Engineering, Part One, Sources of Energy</td><td></td><td colspan="2">Design</td></tr>
<tr><td>107</td><td colspan="2">Elements of Armament Engineering, Part Two, Ballistics</td><td>203</td><td colspan="2">*Rotorcraft Engineering, Part Three, Qualification Assurance</td></tr>
<tr><td>108</td><td colspan="2">Elements of Armament Engineering, Part Three, Weapon Systems and Components</td><td>205<br>210</td><td colspan="2">*Timing Systems and Components<br>Fuzes</td></tr>
<tr><td>109</td><td colspan="2">Tables of the Cumulative Binomial Probabilities</td><td>211(C)</td><td colspan="2">Fuzes, Proximity, Electrical, Part One (U)</td></tr>
<tr><td>110</td><td colspan="2">Experimental Statistics, Section 1, Basic Concepts and Analysis of Measurement Data</td><td>212(S)<br>213(S)</td><td colspan="2">Fuzes, Proximity, Electrical, Part Two (U)<br>Fuzes, Proximity, Electrical, Part Three (U)</td></tr>
<tr><td>111</td><td colspan="2">Experimental Statistics, Section 2, Analysis of Enumerative and Classificatory Data</td><td>214(S)<br>215(C)</td><td colspan="2">Fuzes, Proximity, Electrical, Part Four (U)<br>Fuzes, Proximity, Electrical, Part Five (U)</td></tr>
<tr><td>112</td><td colspan="2">Experimental Statistics, Section 3, Planning and Analysis of Comparative Experiments</td><td>235<br>239(S)</td><td colspan="2">*Hardening Weapon Systems Against RF Energy<br>*Small Arms Ammunition (U)</td></tr>
<tr><td>113</td><td colspan="2">Experimental Statistics, Section 4, Special Topics</td><td>240(S)<br>241(S)</td><td colspan="2">Grenades (U)<br>*Land Mines (U)</td></tr>
<tr><td>114</td><td colspan="2">Experimental Statistics, Section 5, Tables</td><td>242</td><td colspan="2">Design for Control of Projectile Flight</td></tr>
<tr><td>115</td><td colspan="2">Environmental Series, Part One, Basic Environmental Concepts</td><td></td><td colspan="2">Characteristics (REPLACES -246)</td></tr>
<tr><td>116</td><td colspan="2">*Environmental Series, Part Two, Basic Environmental Factors</td><td>244</td><td colspan="2">Ammunition, Section 1, Artillery Ammunition--General, with Table of Contents, Glossary, and Index for Series</td></tr>
<tr><td>120</td><td colspan="2">Criteria for Environmental Control of Mobile Systems</td><td>245(C)</td><td colspan="2">Ammunition, Section 2, Design for Terminal Effects (U)</td></tr>
<tr><td>121</td><td colspan="2">**Packaging and Pack Engineering</td><td>246</td><td colspan="2">+Ammunition, Section 3, Design for Control of</td></tr>
<tr><td>123</td><td colspan="2">Hydraulic Fluids</td><td></td><td colspan="2">Flight Characteristics (REPLACED BY -242)</td></tr>
<tr><td>125</td><td colspan="2">Electrical Wire and Cable</td><td>247</td><td colspan="2">Ammunition, Section 4, Design for Projection</td></tr>
<tr><td>127</td><td colspan="2">Infrared Military Systems, Part One</td><td>248</td><td colspan="2">+Ammunition, Section 5, Inspection Aspects of</td></tr>
<tr><td>128(S)</td><td colspan="2">*Infrared Military Systems, Part Two (U)</td><td></td><td colspan="2">Artillery Ammunition Design</td></tr>
<tr><td>130</td><td colspan="2">Design for Air Transport and Airdrop of Materiel</td><td>249</td><td colspan="2">Ammunition, Section 6, Manufacture of Metallic Components of Artillery Ammunition</td></tr>
<tr><td>133</td><td colspan="2">*Maintainability Engineering Theory and Practice</td><td>250</td><td colspan="2">Guns--General</td></tr>
<tr><td>134</td><td colspan="2">Maintainability Guide for Design</td><td>251</td><td colspan="2">Muzzle Devices</td></tr>
<tr><td>135</td><td colspan="2">Inventions, Patents, and Related Matters</td><td>252</td><td colspan="2">Gun Tubes</td></tr>
<tr><td>136</td><td colspan="2">Servomechanisms, Section 1, Theory</td><td>255</td><td colspan="2">Spectral Characteristics of Muzzle Flash</td></tr>
<tr><td>137</td><td colspan="2">Servomechanisms, Section 2, Measurement and Signal Converters</td><td>260<br>270</td><td colspan="2">Automatic Weapons<br>Propellant Actuated Devices</td></tr>
<tr><td>138</td><td colspan="2">Servomechanisms, Section 3, Amplification</td><td>280</td><td colspan="2">Design of Aerodynamically Stabilized Free</td></tr>
<tr><td>139</td><td colspan="2">Servomechanisms, Section 4, Power Elements and System Design</td><td></td><td colspan="2">Rockets</td></tr>
<tr><td>140</td><td colspan="2">Trajectories, Differential Effects, and Data for Projectiles</td><td>281(SRD)<br>282</td><td colspan="2">Weapon System Effectiveness (U)<br>Propulsion and Propellants (REPLACED BY -285)</td></tr>
<tr><td>145</td><td colspan="2">*Dynamics of a Tracking Gimbal System</td><td>283</td><td colspan="2">Aerodynamics</td></tr>
<tr><td>150</td><td colspan="2">Interior Ballistics of Guns</td><td>284(C)</td><td colspan="2">Trajectories (U)</td></tr>
<tr><td>160(S)</td><td colspan="2">Elements of Terminal Ballistics, Part One, Kill Mechanisms and Vulnerability (U)</td><td>285</td><td colspan="2">Elements of Aircraft and Missile Propulsion (REPLACES -282)</td></tr>
<tr><td>161(S)</td><td colspan="2">Elements of Terminal Ballistics, Part Two, Collection and Analysis of Data Concerning Targets (U)</td><td>286<br>290(C)<br>291</td><td colspan="2">Structures<br>Warheads--General (U)<br>Surface-to-Air Missiles, Part One, System</td></tr>
<tr><td>162(SRD)</td><td colspan="2">Elements of Terminal Ballistics, Part Three, Application to Missile and Space Targets (U)</td><td>292</td><td colspan="2">Integration<br>Surface-to-Air Missiles, Part Two, Weapon</td></tr>
<tr><td>165</td><td colspan="2">Liquid-Filled Projectile Design</td><td></td><td colspan="2">Control</td></tr>
<tr><td>170(C)</td><td colspan="2">**Armor and Its Application (U)</td><td>293</td><td colspan="2">Surface-to-Air Missiles, Part Three, Computers</td></tr>
<tr><td>175</td><td colspan="2">Solid Propellants, Part One</td><td>294(S)</td><td colspan="2">Surface-to-Air Missiles, Part Four, Missile</td></tr>
<tr><td>176(C)</td><td colspan="2">Solid Propellants, Part Two (U)</td><td></td><td colspan="2">Armament (U)</td></tr>
<tr><td>177</td><td colspan="2">Properties of Explosives of Military Interest</td><td>295(S)</td><td colspan="2">Surface-to-Air Missiles, Part Five, Counter-</td></tr>
<tr><td>178(C)</td><td colspan="2">+Properties of Explosives of Military Interest, Section 2 (U) (REPLACED BY -177)</td><td>296</td><td colspan="2">measures (U)<br>Surface-to-Air Missiles, Part Six, Structures</td></tr>
<tr><td>179</td><td colspan="2">Explosive Trains</td><td></td><td colspan="2">and Power Sources</td></tr>
<tr><td>180</td><td colspan="2">*Principles of Explosive Behavior</td><td>297(S)</td><td colspan="2">Surface-to-Air Missiles, Part Seven, Sample</td></tr>
<tr><td>185</td><td colspan="2">Military Pyrotechnics, Part One, Theory and Application</td><td>327</td><td colspan="2">Problem (U)<br>Fire Control Systems--General</td></tr>
<tr><td>186</td><td colspan="2">Military Pyrotechnics, Part Two, Safety, Procedures and Glossary</td><td>329<br>331</td><td colspan="2">Fire Control Computing Systems<br>Compensating Elements</td></tr>
<tr><td>187</td><td colspan="2">Military Pyrotechnics, Part Three, Properties of Materials Used in Pyrotechnic Compositions</td><td>335(SRD)</td><td colspan="2">*Design Engineers' Nuclear Effects Manual, Volume I, Munitions and Weapon Systems (U)</td></tr>
<tr><td>188</td><td colspan="2">*Military Pyrotechnics, Part Four, Design of Ammunition for Pyrotechnic Effects</td><td>336(SRD)</td><td colspan="2">*Design Engineers' Nuclear Effects Manual, Volume II, Electronic Systems and Logistical</td></tr>
<tr><td>189</td><td colspan="2">Military Pyrotechnics, Part Five, Bibliography</td><td></td><td colspan="2">Systems (U)</td></tr>
<tr><td>190</td><td colspan="2">*Army Weapon System Analysis</td><td>337(SRD)</td><td colspan="2">*Design Engineers' Nuclear Effects Manual,</td></tr>
<tr><td>191</td><td colspan="2">System Analysis and Cost-Effectiveness</td><td></td><td colspan="2">Volume III, Nuclear Environment (U)</td></tr>
<tr><td>195</td><td colspan="2">*Development Guide for Reliability, Part One, Introduction, Background, and Planning for Army Materiel Requirements</td><td>338(SRD)<br>340</td><td colspan="2">*Design Engineers' Nuclear Effects Manual, Volume IV, Nuclear Effects (U)<br>Carriages and Mounts--General</td></tr>
<tr><td>196</td><td colspan="2">*Development Guide for Reliability, Part Two, Design for Reliability</td><td>341<br>342</td><td colspan="2">Cradles<br>Recoil Systems</td></tr>
<tr><td>197</td><td colspan="2">*Development Guide for Reliability, Part Three, Reliability Prediction</td><td>343<br>344</td><td colspan="2">Top Carriages<br>Bottom Carriages</td></tr>
<tr><td>198</td><td colspan="2">*Development Guide for Reliability, Part Four, Reliability Measurement</td><td>345<br>346</td><td colspan="2">Equilibrators<br>Elevating Mechanisms</td></tr>
<tr><td>199</td><td colspan="2">*Development Guide for Reliability, Part Five, Contracting for Reliability</td><td>347<br>350</td><td colspan="2">Traversing Mechanisms<br>Wheeled Amphibians</td></tr>
<tr><td>200</td><td colspan="2">*Development Guide for Reliability, Part Six, Mathematical Appendix and Glossary</td><td>355<br>356<br>357</td><td colspan="2">The Automotive Assembly<br>Automotive Suspensions<br>Automotive Bodies and Hulls</td></tr>
</table>

*UNDER PREPARATION--not available     **REVISION UNDER PREPARATION
+OBSOLETE--out of stock

# ATTACHMENT E

*Special Order –*

*Civil Eng.*

**DEPARTMENT OF THE AIR FORCE REGULATION**  AFR 91-26
**DEPARTMENT OF THE ARMY TECHNICAL MANUAL**  TM 5-660
**DEPARTMENT OF THE NAVY MANUAL**  NAVFAC MO-210

| DISTR | SOURCE |
|-------|--------|
| 4TH   | 4TH    |
|       |        |
|       |        |

## REAL PROPERTY OPERATION AND MAINTENANCE

# MAINTENANCE AND OPERATION OF WATER SUPPLY, TREATMENT, AND DISTRIBUTION SYSTEMS

## 30 AUGUST 1984

**DEPARTMENTS OF THE AIR FORCE, THE ARMY, AND THE NAVY**

DEPARTMENTS OF THE AIR FORCE,
THE ARMY, AND THE NAVY
Washington DC 20330

AFR 91–26
TM 5–660
NAVFAC MO–210
30 August 1984

**Real Property Operation and Maintenance**

## MAINTENANCE AND OPERATION OF WATER SUPPLY, TREATMENT, AND DISTRIBUTION SYSTEMS

This publication provides technical guidance for operating and maintaining water supplies, treatment plants, storage facilities, and distribution systems at military installations. It covers water sources, pumping stations, unit operations of water treatment, safe drinking water act requirements, laboratory sampling and testing, recordkeeping requirements, corrosion control in water distribution systems, swimming pool operations, safety and health, and general maintenance. It applies to all personnel responsible for operating and maintaining fixed base water plants and systems.

The use of a name of any specific commercial product, commodity, or service in this publication does not imply endorsement by the military services.

|  | Page |
|---|---|
| Chapter 1—Introduction | |
| Section A—General Information | 8 |
| B—Elements of Water Supply System | 8 |
| C—Reports and Records | 13 |
| D—Emergency Protective Measures | 15 |
| E—Command and Technical Inspections | 17 |
| F—The Safe Drinking Water Act (SDWA) | 17 |
| G—Water Conservation | 17 |
| Chapter 2—Water Supply Requirements | |
| Section A—General Information | 20 |
| B—Quantity Requirements | 21 |
| C—Quality Requirements | 21 |
| Chapter 3—Sources and Development of Water Supplies | |
| Section A—General Information | 28 |
| B—Ground Water Supplies | 29 |
| C—Surface Water Supplies | 44 |
| Chapter 4—Pumps and Pumping Stations | |
| Section A—Information on Pumps | 50 |
| B—Pump-Driving Equipment | 70 |
| C—Pumping Stations | 74 |
| Chapter 5—Meters and Controls | |
| Section A—Functions and Types | 76 |
| B—Sensor Description | 76 |
| C—Instrumentation | 77 |
| D—Water Metering | 79 |
| E—Maintenance Procedures | 84 |

Supersedes AFM 85–13, 5 February 1959; FM 5–660, 24 November 1952; and NAVDOCKS MO–210, June 1964. (See signature page for summary of changes.)
No. of Printed Pages: 301
OPR: HQ AFESC/DEMM (Cecil E. Myers)
Approved by: HQ AFESC/CV (Col Jerry A. Smith)
Distribution: See page 267.

This publication contains copyrighted material.

                                                                                                          Page
Chapter 6—Water Treatment
        Section A—Aeration Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        90
                 B—Iron and Manganese . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          93
                 C—Taste and Odor Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .           95
                 D—Coagulation, Flocculation, and Sedimentation . . . . . . . . . . . . . . . . . . . . . .          99
                 E—Softening. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   111
                 F—Filtration Processes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       124
                 G—Fluoridation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      141
                 H—Disinfection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      147
                 I—Chemicals and Chemical Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . .              165
                 J—Water Desalination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         179
                 K—Water Treatment Plant Residues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            185
                 L—Control of Organics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        189
                 M—Water Sampling and Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            192

Chapter 7—Corrosion and Deposit Control
        Section A—General Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          194
                 B—Corrosion Control. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       194
                 C—Deposit Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        207
                 D—System Surveillance and Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .           211

Chapter 8—Distribution and Storage
        Section A—Distribution System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          214
                 B—Storage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    225

Chapter 9—Valves
        Section A—General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         231
                 B—Automatic Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       234
                 C—Manually Operated Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          236
                 D—Valve Operators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        240
                 E—Backflow Preventers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       241

Chapter 10—Swimming Pools
        Section A—General Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         245
                 B—Pool Water Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         247
                 C—Seasonal Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      253
                 D—Records and Operating Log. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          256
                 E—Wading Pools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       256

Chapter 11—General Maintenance
        Section A—General Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          257
                 B—Tools and Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          257
                 C—Lubrication Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        259
                 D—Protective Coatings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       260
                 E—Cleaning Solvents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        260
                 F—Measuring Operating Temperatures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            261

Chapter 12—Safety and Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         264

Figures
1–1.      Common Military Water Sources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            8
1–2.      Shallow-Well Supply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       10
1–3.      Deep-Well Supply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        10
1–4.      Treated Surface Supply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        10
1–5.      Water Distribution Symbols . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          14
3–1.      The Hydrologic Cycle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        28
3–2.      Subsurface and Ground Water Phase of the Hydrologic Cycle . . . . . . . . . . . . . . . . . .            30

AFR 91-26/TM 5-660/NAVFAC    MO-210    30 August 1984    3

Page

3-3.    Dug Well With Two-Pipe Jet Pump Installation .................................... 30
3-4.    Different Kinds of Drive-Well Points .......................................... 30
3-5.    Properly Constructed Spring ................................................ 31
3-6.    Infiltration Gallery ...................................................... 32
3-7.    Ranney Collector Showing Superstructure, Caisson, and Laterals .................. 33
3-8.    Naturally Developed Well .................................................. 34
3-9.    Drilled Well ........................................................... 34
3-10.   Pumping Effects on Aquifers ............................................... 34
3-11.   Typical Well Pumping and Recovery Test ...................................... 36
3-12.   Using Air Line To Find Depth of Water Level .................................. 37
3-13.   Jetting Tool for Well Screen Cleaning ....................................... 39
3-14.   Piping Arrangement for Backwashing and Backblowing ........................... 40
3-15.   Wells Polluted by Flow From an Abandoned Well Through Fissured Rock ............ 44
4-1.    Cross-Section Diagram of Volute-Centrifugal Pump ............................. 51
4-2.    Horizontal Split-Case Double-Suction Volute-Centrifugal Pump .................. 52
4-3.    Cross-Section Diagram of Diffuser Pump ...................................... 52
4-4.    Vertical Axial-Flow Pump With Screw-Type Impeller ........................... 53
4-5.    Cross-Section Diagram of Mixed-Flow Pump .................................... 53
4-6.    Water-Lubricated Vertical Turbine Pump ..................................... 54
4-7.    Impeller and Housing of Regenerative Turbine Pump ........................... 55
4-8.    Comparison of Regenerative Turbine and Volute-Centrifugal Pumps ............... 55
4-9.    Principle of Air-Lift ..................................................... 56
4-10.   Ejector Pump Installed Over Well ........................................... 56
4-11.   Ejector Pump Installed Away From Well ...................................... 56
4-12.   Vertical Helical-Rotary High-Lift Pump ..................................... 57
4-13.   Several Types of Rotary-Displacement Pumps .................................. 58
4-14.   Reciprocating Well Pump, Single-Stroke, Single Acting Cylinder ................ 59
4-15.   Cross-Section Diagram of Reciprocating Sludge Pump ........................... 60
4-16.   Types of Wearing (Sealing) Ring ............................................ 66
4-17.   Cross-Section Diagram of Two-Stage Centrifugal Pump .......................... 68
5-1.    Changes in Pressure (H) and Permanent Loss of Head in Venturi, Flow Nozzle, and Orifice ... 76
5-2.    Rectangular Weir ........................................................ 77
5-3.    Magnetic-Drive Disc Meter ................................................. 79
5-4.    Turbine Meter ........................................................... 80
5-5.    Propeller Meter ......................................................... 80
5-6.    Proportional Meter ....................................................... 81
5-7.    Compound Meter .......................................................... 82
5-8.    Magnetic-Flow Meter ...................................................... 82
5-9.    Straight-Reading Meter Dial ............................................... 83
5-10.   Cricular-Reading Meter Dial ............................................... 83
5-11.   Plan and Section of Parshall Flume ......................................... 83
5-12.   Pitot Tube Installation ................................................... 84
5-13.   Simple Orifice Meter ..................................................... 84
6-1.    Coke Tray Aerator ....................................................... 90
6-2.    Continuous Reading, Low-Range Turbidimeter ................................. 105
6-3.    Flash Mixer ............................................................ 105
6-4.    Rotary-Type Paddle Flocculators ........................................... 106
6-5.    Walking-Beam Flocculator .................................................. 106
6-6.    Ideal Sedimentation Basin ................................................. 107
6-7.    Typical Circular Clarifier Configurations ................................... 107
6-8.    Tube Settler Flow Pattern ................................................. 108
6-9.    Upflow Solids—Contact Clarifier ........................................... 109
6-10.   Typical Plant Arrangement for Single-Stage Softening With Recarbonation ........ 115
6-11.   Typical Plant Arrangement for Two-Stage Softening With Recarbonation ........... 115
6-12.   Typical Plant Arrangement for Split-Treatment Softening ...................... 116
6-13.   Paste-Type Lime Slaker ................................................... 117
6-14.   Spiractor Precipitator .................................................... 117

Page

6–15.   Downflow Ion-Exchange Unit for Water Softening ........................................... 120
6–16.   Slow Sand Filter Operational Diagram ..................................................... 126
6–17.   Typical Filter, Showing Relationship of Perforated Laterals. ............................... 127
6–18.   Perforated Tile Underdrain System ....................................................... 128
6–19.   Sectional View of Rate-of-Flow Controller. ................................................ 129
6–20.   Loss-of-Head Measurement ............................................................... 130
6–21.   Multiple Hook Gage. ..................................................................... 131
6–22.   Pressure Versus Depth in a Gravity Filter at Various Times During a Filter Run ............ 131
6–23.   Operating a Rapid-Sand Filter ........................................................... 132
6–24.   Hand-Operated Pressure-Type Rapid Sand Filters .......................................... 139
6–25.   Typical Pressure Precoat Filters ........................................................ 140
6–26.   Typical Flow-Through Diagram for a Pressure Precoat Filter. ............................... 140
6–27.   Precoat Filter Precoat Layer. ........................................................... 140
6–28.   Precoat Filter With Body Feed ........................................................... 141
6–29.   Nomogram for Determining Dosage of Flouride-Bearing Chemicals ............................ 143
6–30.   Representative Breakpoint Chlorination Curve (N = 1 mg/l). ................................ 149
6–31.   Distribution of HOCl and OCl in Water at Indicated pH Levels ............................. 150
6–32.   Vapor Pressure of Liquid Chlorine. ...................................................... 151
6–33.   Cross-Section Diagram of Chlorine Ton Container .......................................... 152
6–34.   Typical Chlorinator Installation Utilizing Gas Withdrawal. ............................... 153
6–35.   Typical Chlorinator Installation Utilizing Liquid Withdrawal ............................. 154
6–36.   Flow Diagram of Pulsating-Type Chlorinator .............................................. 155
6–37.   Flow Diagram of Vacuum-Type Water-Diaphragm Chlorinator. ................................. 156
6–38.   Flow Diagram of Vacuum-Type Mechanical-Diaphragm Chlorinator. ............................ 156
6–39.   Flow Diagram of Vacuum-Type Diaphragm-Controlled Chlorinator ............................. 157
6–40.   Flow Diagram of Vacuum-Type V-Notch Chlorinator ......................................... 158
6–41.   Cross-Section Diagram of Chlorine Evaporator ............................................ 159
6–42.   Cross-Section Diagram of Mechanically-Actuated Diaphragm Hypochlorinator ................. 159
6–43.   Typical Arrangement of Electric Motor-Driven Hypochlorinator ............................. 159
6–44.   Typical Arrangement of Automatic, Water-Operated, Meter-Paced Hypochlorinator ............ 160
6–45.   Rotating Disc Chemical Feeder. .......................................................... 170
6–46.   Oscillating Chemical Feeder. ............................................................ 171
6–47.   Rotary Gate Chemical Feeder. ............................................................ 172
6–48.   Gravimetric Belt-Type Chemical Feeder ................................................... 172
6–49.   Screw Chemical Feeder. .................................................................. 173
6–50.   Chemical Saturator ...................................................................... 174
6–51.   Rotating Dipper Feeder .................................................................. 174
6–52.   Decanter Solution Feeder ................................................................ 175
6–53.   Pressure Solution Feed Pumps ............................................................ 175
6–54.   Simplified Diagram of the Long-Tube Vertical Distillation Process ........................ 179
6–55.   Simplified Diagram of the Multistage Flash Distillation Process. ......................... 180
6–56.   Simplified Diagram of the Vapor Compression Distillation Process ......................... 180
6–57.   Mechanical Tube Cleaning Equipment ...................................................... 182
6–58.   Simplified Diagram of the Electrodialysis Process ....................................... 184
6–59.   Simplified Diagram of the Reverse Osmosis Process. ...................................... 185
6–60.   Typical Vacuum Filter Flow Diagram. ..................................................... 188
6–61.   Centrifuge Operation .................................................................... 188
6–62.   Filter Press. ........................................................................... 188
7–1.    Characteristics of Metallic Corrosion ................................................... 195
7–2.    Relationship of Carbon Dioxide Versus Alkalinity ........................................ 197
7–3.    Effect of pH and Dissolved Oxygen on the Corrosion Rate of Iron in Water. ................ 198
7–4.    Effect of Temperature on Corrosion of Iron. ............................................. 198
7–5.    Principles of Galvanic Corrosion ........................................................ 199
7–6.    Corrosion Caused by Dissimilar Metals ................................................... 200
7–7.    Water Line With Excessive Corrosion ..................................................... 200
7–8.    Corrosive Attack by Carbon Dioxide and Oxygen ........................................... 200
7–9.    Principle of Cathodic Protection ........................................................ 206

5

Page

| | | |
|---|---|---|
| 7-10. | Cathodic Protection of Buried Pipeline Using External Power Source | 206 |
| 7-11. | Hot Water Tank Showing Magnesium Rods and Special Fittings | 207 |
| 7-12. | Determination of pHs From Hardness, Alkalinity, and Temperature | 209 |
| 7-13. | Relationship of pH Versus Alkalinity | 210 |
| 7-14. | Effect of Threshold Treatment | 211 |
| 7-15. | Layout of Test-Pipe Loop To Observe Treatment of Corrosive Water | 212 |
| 8-1. | Typical Distribution System Layout | 215 |
| 8-2. | Power Required To Overcome Friction in Encrusted Pipe | 218 |
| 8-3. | Connection Points for Thawing Service Lines | 220 |
| 8-4. | Typical Fire Hydrant | 223 |
| 9-1. | Valve Box Applied to Gate Valve | 231 |
| 9-2. | Air-Release Valve | 234 |
| 9-3. | Hydraulically Actuated, Globe Pattern Altitude Valve | 234 |
| 9-4. | Typical Swing Check Valve | 235 |
| 9-5. | Pressure Reducing Valve | 235 |
| 9-6. | Typical Non-Rising Stem Gate Valve | 236 |
| 9-7. | Butterfly Valve | 237 |
| 9-8. | Lubricated Plug Valve | 238 |
| 9-9. | Curb Stop | 238 |
| 9-10. | Outside Screw and Yoke Globe Valve | 239 |
| 9-11. | Sluice Gate | 240 |
| 9-12. | Installation of a Reduced Pressure Principle Device | 242 |
| 9-13. | Double Check Valve | 242 |
| 9-14. | Pressure Vacuum Breaker | 242 |
| 9-15. | Atmospheric Vacuum Breaker | 242 |
| 9-16. | Safe Air Gap—Ground Level Storage Tank | 243 |
| 9-17. | Parallel Installation | 243 |
| 10-1. | Suction Cleaner in Use | 246 |
| 10-2. | Typical Pool Water Treatment Installation | 247 |
| 10-3. | Operating Instructions for Typical Swimming Pool With Pressure Sand Filtration System | 249 |
| 10-4. | Operating Instructions for Typical Swimming Pool With Pressure Diatomaceous Earth Filtration System | 250 |
| 10-5. | Hair Catcher | 252 |

Tables

| | | |
|---|---|---|
| 2-1. | Effect of Rainfall on Water Use | 21 |
| 2-2. | Variations in Rates of Demands for Water | 22 |
| 2-3. | Most Effective Treatment Methods—Primary Standards | 26 |
| 2-4. | Most Effective Treatment Methods—Secondary Standards | 26 |
| 3-1. | Materials Required for 100 Gallons of Chlorine Solution | 38 |
| 3-2. | Gallons of Water per Foot of Depth for Various Well Diameters | 38 |
| 3-3. | Jetting Nozzle Discharge | 40 |
| 3-4. | Eductor Submergence Required for Various Well Depths | 40 |
| 3-5. | Air Requirements for Backwashing Well Screen With Air Lift | 41 |
| 3-6. | Maintenance Procedures for Ground-Water Supplies | 43 |
| 3-7. | Maintenance Procedures for Surface-Water Supplies | 47 |
| 3-8. | Approximate Toxic and Safe Copper Sulfate Dosages for Various Fish Species | 48 |
| 4-1. | Pump Classification by Use (Service) | 50 |
| 4-2. | Comparison of Pump Characteristics | 51 |
| 4-3. | Comparison of Pump Discharge and Head | 51 |
| 4-4. | Troubleshooting Checklist for Centrifugal Pumps | 61 |
| 4-5. | Troubleshooting Checklist for Air-Lift Pumps | 63 |
| 4-6. | Troubleshooting Checklist for Helical-Rotor Well Pumps | 64 |
| 4-7. | Troubleshooting Checklist for Vertical Turbine Well Pumps | 65 |
| 4-8. | Lubrication Schedule for Centrifugal-Type Pumps | 66 |
| 4-9. | Hand Oiler Adjustment | 68 |
| 4-10. | Diametrical Clearance of Water-Lubricated Cutless-Rubber Bearings | 70 |

6                    **AFR 91–26/TM 5–660/NAVFAC    MO–210    30 August 1984**

|  | | Page |
|---|---|---|
| 4–11. | Troubleshooting Chart for Chain Drives | 73 |
| 5–1. | Maintenance Procedures for Flow, Pressure, and Level Sensors | 85 |
| 5–2. | Maintenance Procedures for Transmission Systems | 86 |
| 5–3. | Maintenance Procedures for Indicators, Registers, and Recorders | 87 |
| 5–4. | Maintenance Procedures for Water Meters | 89 |
| 5–5. | Maintenance Procedures for Weirs and Flumes | 89 |
| 6–1. | Maintenance Procedures for Aeration Equipment | 92 |
| 6–2. | Theoretical Chemical Requirements for Chemical Oxidation of Iron and Manganese | 94 |
| 6–3. | Determination of Proper Carbon Dosage for Different Odor Concentrations | 96 |
| 6–4. | Optimum pH Ranges for Common Coagulants | 103 |
| 6–5. | Maintenance Procedures for Coagulation, Flocculation, Sedimentation | 110 |
| 6–6. | Hardness Classification of Water | 111 |
| 6–7. | Maintenance Procedures for Ion-Exchange Softening Units | 122 |
| 6–8. | Typical Granular Media Characteristics | 126 |
| 6–9. | Maintenance Procedures for Gravity Filtration Equipment | 137 |
| 6–10. | Recommended Fluoride Concentrations at Different Temperatures | 141 |
| 6–11. | Characteristics of Fluoride Compounds | 144 |
| 6–12. | Recommended Chlorine Inventory | 154 |
| 6–13. | Chlorine Compounds Used To Prepare 1 Percent Dosing Solution | 160 |
| 6–14. | Minimum Chlorine Dosages for Disinfecting Pipes, Tanks, and Treatment Units | 161 |
| 6–15. | Volume of Water in Various Pipe Sizes Per Foot of Length | 161 |
| 6–16. | Pounds of Alkaline Material Required To Neutralize One Pound of Chlorine Gas | 163 |
| 6–17. | Solution-Feed, Vacuum-Operated Gas Chlorinator Troubleshooting Chart | 164 |
| 6–18. | Maintenance Procedures for Chlorination Equipment | 165 |
| 6–19. | Chemicals Used in Water Treatment | 166 |
| 6–20. | Maintenance Procedures for Dry Chemical Feeders | 176 |
| 6–21. | Maintenance Procedures for Solution Chemical Feeders | 178 |
| 6–22. | Maintenance Procedures for Distillation Equipment | 183 |
| 6–23. | Water Treatment Plant Residue Disposal Summary | 187 |
| 7–1. | Corrosion Types and Occurrence | 196 |
| 7–2. | Galvanic Series for Common Metals | 199 |
| 7–3. | Corrosiveness of Salts in Solution | 201 |
| 7–4. | Corrosion of Ferrous Metals by Soils | 202 |
| 7–5. | Corrosion and Scaling Classification of Potable Waters | 203 |
| 8–1. | Current and Voltage Required To Thaw Wrought Iron and Cast Iron Pipe | 220 |
| 8–2. | Maintenance Procedures for Distribution System Mains | 226 |
| 8–3. | Maintenance Procedures for Fire Hydrants | 226 |
| 8–4. | Maintenance Procedures for Storage Facilities | 228 |
| 9–1. | Maintenance Procedures for Valves and Accessories | 232 |
| 9–2. | Approved Backflow Devices | 241 |
| 9–3. | Suggested Time Intervals for Inspection | 243 |
| 10–1. | Factors for Calculating Simplified Langelier Saturation Index for Swimming Pool Water | 252 |
| 10–2. | Troubleshooting Guide for Swimming Pool Operation | 254 |
| 11–1. | Suggested Tools for Water Treatment Plants | 258 |
| 11–2. | Suggested Equipment for Water Treatment Plants | 260 |
| 11–3. | Suggested Materials and Supplies for Water Treatment Plants | 261 |
| 11–4. | Lubricating Oils, Greases, and Preservatives | 262 |
| 11–5. | Lubricating Oil and Grease Uses | 263 |

Attachments
| 1. | Glossary of Terms | 268 |
| 2. | Abbreviatons | 282 |
| 3. | Charts and Tables | 283 |
| 4. | References | 291 |
| 5. | Subject Index | 293 |

Forms Prescribed

| | Paragraph | Page |
|---|---|---|
| AF 708, Swimming Pool Operating Log | 10-19 | 256 |
| AF 995, Gate Valve/Hydrant Record | 1-11e | 14 |
| AF 996, Well Data | 1-11i | 15 |
| AF 997, Daily Well Activity Record | 3-8 | 42 |
| AF 998, Daily Pumping Station Activity Record Water | 4-7c | 74 |
| AF 1460, Water Utility Operating Log (Supplemental) | 1-10b(2) | 13 |
| AF 1461, Water Utility Operating Log (General) | 1-10b(1) | 13 |
| DA 3164R, Swimming Pool Operating Log | 10-19 | 256 |
| DA 4374, Repairs and Utilities Operating Log (Water-Supplementary) | 1-10b(2) | 13 |
| DD 686, Fluoride/Bacteriological Examination of Water | 6-103 | 193 |
| NAVFAC 11330/6, Water Utility Operating Log (Supplemental) | 1-10b(2) | 13 |
| NAVFAC 11340/2, Potable Water Treatment Operating Record | 1-10b(1) | 13 |

## Chapter 1

## INTRODUCTION

### Section A—General Information

**1-1. Command Responsibility.** Operating and maintaining water treatment facilities and appurtenant equipment are a command responsibility. They are considered maintenance-of-installation functions.

**1-2. Personnel Standards:**

**a. General Information.** Using manpower in water treatment facilities effectively is important at all times for efficiency and economy, and is essential during periods of national emergency.

**b. Number of Personnel Required.** Military water treatment facilities vary so greatly in design, arrangement, and complexity, that establishing the number of personnel needed cannot be determined solely by installation population or water usage. During periods of peak demand, when additional personnel are needed, shifts should be scheduled so that they overlap, thus avoiding hiring additional personnel.

**c. Operator Certification.** Most states have statutes that require water treatment plant operators to be properly trained and certified. The Safe Drinking Water Act (SDWA) of 1974 (Public Law 93–523) requires all water treatment plants in states that have primary enforcement responsibility to comply with state statutes regarding water quality standards, operator training, and operator certification.

**d. Training Needs.** After an operator is certified, continual training is essential to maintain high standards of service, ensure efficient operation, and keep personnel informed of all current technical developments.

(1) All personnel must be made aware that the health and safety of those residing at the installation depend on their conscientious execution of their duties.

(2) Short courses or water treatment conferences should be attended periodically by all personnel who are involved in operating the installation's water treatment facilities. Such short courses and conferences are sponsored by state health departments, university extension programs, community colleges, and the American Water Works Association (AWWA). In addition, local training programs can be held on the installation with supervisory personnel conducting the training.

### Section B—Elements of Water Supply System

**1-3. General Information.** Water supply systems of military installations must meet the qualitative and quantitative needs for both domestic use and fire protection.

a. Domestic uses of water include drinking, cooking, washing, bathing, sewage disposal, cleaning equipment, swimming pools, air-conditioning, and watering lawns.

b. The potential requirement of water for fighting fire is a critical factor in the overall planning of water shortage and distribution systems. The size and specific nature of the installation to be protected determine the quantity of water required for fire protection.

**1-4. Water Supply Sources:**

**a. General Information.** The potential sources of water for military installations (see figure 1-1) are deep wells, shallow wells, rivers, natural lakes, and reservoirs. Rain catchment and desalination are also potential water supply sources for specific installations. No two water sources are alike. Even those with the same origin may produce water of varying quality at different times. Each of these various water sources must be treated in a different way to achieve quality potable water.



**Figure 1-1. Common Military Water Sources.**

**b. Purchases Supplies.** The best way to provide potable water at certain military installations is to buy it from a nearby municipality or private water company. However, the military installation often installs and maintains their own distribution and storage system that is directly connected into the water mains of the commercial source.

**c. Ground Water Supplies:**

(1) Source. Most ground water used for water supplies comes from rain or snow. The earth's water cycle, (see figure 3–1) depends on many events.

(a) The amount of water depends on several factors. Some of it is lost by direct evaporation or is used by plant life, later to be released to the atmosphere as water vapor. Some flows away as surface runoff. The remaining precipitation sinks deeply into the soil to become ground water reservoirs that supplies water to wells.

(b) Geological formations or strata from which ground water can be obtained are called aquifers. To be an aquifer, a geological formation must contain pores or spaces that can hold water and allow the water to move through them towards wells and springs.

# ATTACHMENT D

0084

RECEIVED
COMMUNICATIONS CENTER

OCT 5   14 05z79

'TTUZYUW RUEADWD8367 2772209-UUUU--RUWTLOA.
ZNR UUUUU
' 041910Z OCT 79
M DA WASH DC //DAEN-MPC-I
O RUKLDAR/CDRDARCOM ALEX VA //DRCIS-E//
NFO RUCIAFB/CDRDARCOM IASA ROCK ISLAND//DRCIS-RI-IC//
RUCIAFB/CDRARRCOM ROCK ISLAND IL//DRSAR-IS//
RUWTLOA/CDRLHAAP MARSHALL TX//SARLC//
RULNAPG/CDREHA APG MD//HSE-E//
EN/DIVENGR USAEDH HUNTSVILLE AL//HNDED-PM//
EN/DIVENGR USAEDSW DALLAS TX//SWDED-M//
EN/DISTENGR FT WORTH TX//SWFED-M//
IT
UNCLAS
SUBJ:  PROJECT VALIDATION, APAP, PN6 EWI LONGHORN AAP, TX
.,  RECENTLY THIS OFFICE BECAME AWARE THAT THE TEXAS AIR CONTROL
BOARD (TACB) GRANTED, BY LETTER DTD 17 APR 79, PERMISSION TO LONGHORN
AAP TO PERFORM OUTDOOR BURNING OF EXPLOSIVE WASTE FOR AN INDEFINITE
PERIOD OF TIME.  THIS ACTION WAS SUBSEQUENTLY FOLLOWED BY A LETTER TO
LONGHORN FROM REGION VI, EPA, DTD 16 MAY 79 WHICH FAILED TO RE-
COGNIZE THE TACB PERMISSION AS WAIVER AUTHORITY WAS NOT INCLUDED AS
PART OF THE STATES IMPLEMENTATION PLAN (SIP).  IT WOULD APPEAR FROM


PAGE 2 RUEADWD8367 UNCLAS
THIS EXCHANGE THAT THE NECESSITY TO PROCEED WITH THE EWI, PN 6 AT
LONGHORN AAP IS TECHNICALLY NOT REQUIRED AND THAT THE TACB SHOULD BE
REQUESTED TO MODIFY THEIR SIP TO ALLOW SUCH WAIVERS.
2.  BIDS WERE OPENED FOR PN 6 ON 7 SEP 79 WITH A 90 DAY BID
ACCEPTANCE PERIOD.  THIS PROJECT REQUIRES CONGRESSIONAL AUTHORIZATION
PRIOR TO AWARD DUE TO COST OVERRUN.  SUBMISSION OF A COST VARIATION
REPORT THROUGH DA AND OSD TO THE CONGRESSIONAL COMMITTEES SHOULD BE
INITIATED ON OR ABOUT 15 OCT 79 IN ORDER TO SECURE APPROVAL PRIOR TO
BID EXPIRATION.  HOWEVER, OCE CANNOT CONSCIONABLY REQUEST A COST
VARIATION FOR A PROJECT FOR WHICH A REQUIREMENT MAY NOT EXIST.
3.  REQUEST YOU REVALIDATE THE REQUIREMENT FOR THIS PROJECT, IN LIGHT
OF PARA 1, ABOVE, AND NOTIFY DAEN-MPC-I OF YOUR FINDINGS NLT
12 OCT 79.
BT
#8367


NNNN

RECEIVED
COMMUNICATIONS CENTER

Oct 15   13 11:79

PTTUZYUW RUCIAFA6081 2852037-UUUU--RUWTLOA.
ZNR UUUUU
P 122030Z OCT 79
FM CDRARRCOM ROCK ISL IL //DRSAR-ISE//
TO RUKLOAR/CDRDARCOM ALEX VA //DRCIS-EF/DRCIS-A/DRCGC//
INFO ZEN/CDR DARCOM I&SA ROCK ISL IL //DRCIS-RI-IC//
RUWTLOA/CDR LHAAP MARSHALL TX //SARLO//
RULNEHA/CDRUSAEHA APG-EA MD //HSE-E//
RUWJBTA/CDRTEAD TOOELE UT //SDSTE-AEO//
RUEADWD/DA WASHDC //DAEN-MPC-I//
RUCOGDA/DIVENGR USAEDH HUNTSVILLE AL //HNDED-PM//
RUWIUFB/DIVENGR USAEDSW DALLAS TX //SWDED-M//
RUWTAEA/DISTENGR FORT WORTH TX //SWFED-M//
BT
UNCLAS
SUBJ PROJECT VALIDATION APAP PN6 EWI LONGHORN AAP TX
A. MSG HQDA DAEN-MPC-I 041910Z OCT 79 SAB.
B. MSG HQ DARCOM DRCIS-EF 051200T OCT 79 SAB.
C. MSG CDR LONGHORN AAP SARLO 111645Z OCT 79 SAB.
D. RETRANSMITTAL OF MSG C ABOVE HQ ARRCOM DRSAR-ISE 121410Z OCT 79 SAB.
1. THIS HQ HAS REVIEWED ABOVE MESSAGES FOR SUBJECT PROJECT AND CONCUR
WITH CDR LONGHORN AAP RECOMMENDATION TO NOT BUILD THE EWI. THIS HQ IS
NOT AWARE OF ANY REQUIREMENT TO CONTINUE WITH PROJECT CONSTRUCTION.


PAGE 2 RUCIAFA6081 UNCLAS
HOWEVER,THERE APPEARS TO BE A REMAINING DISAGREEMENT CONCERNING THE
TEXAS STATE IMPLEMENTATION PLAN (SIP). THIS HQ DOES NOT BELIEVE IT IS
PRUDENT TO BUILD THIS EWI SOLELY BECAUSE OF A USEPA REGION VI BELIEF
THAT THE STATE OF TEXAS IS  NOT ACTING WITHIN THE PROVISIONS OF THEIR
SIP ESPECIALLY WHEN USEPA REGION VI IS UNWILLING TO PROCEED WITH ACTIONS
AGAINST THE STATE FOR NOT ADMINISTERING THE SIP IN ACCORDANCE WITH USEPA
REGION VI INTERPRETATIONS.
2. THE TEXAS AIR CONTROL BOARD (TCAB) EXECUTIVE DIRECTOR HAS GRANTED
AUTHORITY TO OPEN BURN EXPLOSIVE WASTE FOR AN INDEFINITE PERIOD OF
TIME. THERE APPEARS TO BE  NO ADVANTAGE TO REQUESTING A WRITTEN TCAB
REAFFIRMATION OF THE PERMIT TO OPEN BURN. CDRLHAAP HAS OBTAINED A
VERBAL ASSURANCE THAT TCAB STANDS BY ITS AUTHORITY TO ISSUE THE EXEMP-
TION NOW IN HAND. YOUR ATTENTION IS DIRECTED TO PARA 3 OF REF C
CONCERNING USEPA REGION VI.
3. THIS HQ ALSO CONCURS WITH THE COMPLETION OF DESIGN OF THE EWI FOR
LHAAP. TOOELE AD - AEO DATA ON LHAAP MATERIALS WILL BE BENEFICIAL TO
CONTINUED EFFORTS TO CHARACTERIZE AND IDENTIFY EFFECTS OF BURNIG UNDER
OTHER THAN ORDNANCE DESIGN CONDITIONS.
BT
#6081

# ATTACHMENT F

# MEETING AGENDA

Opening Comments                              Ltc. Sowa

Introductions                                 Ltc. Sowa

    Wade Wheatley       TNRCC
    Mark Ferrin         Thiokol
    David Burroughs     ~~S & E Engineering, Inc.~~  *Consultant*

Briefing                                      David Burroughs

  I.     History of Motor Firings LHAAP

  II.    Motors to Fired
          Physical Information
          Video Presentation
          Products of Combustion

  III.   Environmental Compliance
          Environmental Comparisons Before and After
          Static Firing
          Wildlife/Fish Information

  IV.   Synopsis

  V.    Question and Answer Period

  VI.   Closing Comments

An environmental evaluation performed in September 1991 by Ebasco Environmental, Inc. subsequent to the demilitarization of the Pershing rocket motors included data which conclusively indicated that no contamination of Caddo Lake or the surrounding atmosphere occurred from the static firing of the motors. Aluminum and hydrochloric acid concentrations were below detectable limits near Caddo Lake during and after the Pershing program. The pH levels of Caddo Lake remained between 6.5 and 7.1 during and after the firings. Additionally, noise levels during the firings increased by a maximum of 15 dBA for a few seconds, and these short-duration increases appeared to have no effect on the wildlife on the installation. No noise complaints were received at Longhorn from nearby residents during the Pershing program.

The conclusion of the environmental evaluation was that no significant, widespread environmental impact was realized from the Pershing rocket motor demilitarization.

# ATTACHMENT G

# DEPARTMENT OF THE ARMY

HEADQUARTERS. U.S. ARMY ARMAMENT. MUNITIONS AND CHEMICAL COMMAND
ROCK ISLAND, ILLINOIS 61299-6000

REPLY TO
ATTENTION OF

AMSMC-PCG-B (R)   (715k)

S:   24 July 1991

2 7 JUN 1991

MEMORANDUM FOR Commander, Longhorn Army Ammunition Plant, ATTN:  SMCLO-CA.
Marshall, TX  75671-1059

SUBJECT:  Demilitarization of 5 Inch HVAR MK 10 Rocket Motors
(NSN 1340-00-038-8444)

1.  Request a SF1411 and Administrative Contracting Officer review for a
quantity of 56,862 subject motors.  A proposed monthly delivery schedule is
required from the contractor for the program duration.  It is desired work
start as soon as possible.  There can be no program carry-over of funds from
one fiscal year to the next.  Personnel impact created by additional workload
must be addressed under this proposal.

2.  The motor loading assembly drawing (656724) and MK 18 propellant grain
data sheet are enclosed to assist the contractor in cost estimating.

3.  It is recommended static firing be considered as the demil method.

4.  Suspense of 24 July 1991 is requested for completion of contract proposal
and Administrative Contracting Officer reveiw.  An information copy is required
for AMSMC-DSM-D.

5.  The points of contact are Mr. C. Rarick, AMSMC-DSM-D, DSN 793-3980, and
Mrs. Jan Franke, AMSMC-PCG-B (R), DSN 793-3360.

EMIL E. MASLANKA
Contracting Officer

2 Encls
as

CF  (wo/encl):
AMSMC-PDW

## Demilitarization of the 5 Inch HYVAR Rocket Motor

### Description of Operation

1. **Rocket Motor Information**

   | | |
   |---|---:|
   | Motor length | 39 inches |
   | Motor diameter | 4.5 inches |
   | Assembly weight | 89 pounds |
   | Propellant Weight | 24 pounds |
   | Motor & Shipping Container Weight | 122 pounds |
   | Gross weight per pallet | 2,540 pounds |
   | Explosive weight per pallet | 480 pounds |
   | Rocket motors per pallet | 20 ea |

2. **Receipt of Rocket Motors**

   Palletized rocket motors will be received F.O.B. Karnack, Texas via common carrier. Upon arrival the tractor/trailer is directed to the assigned storage magazine. A crew consisting of the following personnel will perform the unloading operation.

   **Supervisor** - Supervise the unloading and storage of the palletized material.

   **Receiving Clerk** - Assists in removing dunnage, records pertinent information from each pellet, receive and process paperwork with drivers.

   **Light Equipment Operator** - Operator forklift removes pallets from truck and places in magazine under the direction of the supervisors.

   **Clerk** - Processes the R&I.

   On each firing day, Property personnel will remove 4 ea pallets of rocket motors from the magazine and transfer them to the test area for firing. Since this is a repetitive task minimal supervision by the stores and transportation supervisors are required.

   **Stores Clerk** - Obtains key to magazine, accompanies light equipment operator and truck driver to designated magazine; opens magazine and issues 4 pallets of rocket motors; adjusts magazine inventory and completes transfer paperwork; returns key to key control.

   **Light Equipment Operator** - Drives forklift to magazine; removes pallets from magazine and loads truck. Returns to central dispatching area.

**Page 2**

Truck Driver - Delivers one pallet of rocket motors to firing stands 36T-2 and 36T-3 respectively. The driver delivers the remaining two pallets to adjacent storage area.

The hours listed in paragraph 2 of the back up are based on Property and Material's experience in receiving and issuing materials.

3. Static Firing of Rocket Motors

A pallet of motors is placed in firing bays 36T-2 and 36T-3. Each pallet contains twenty motors ( one motor per container) which are removed from the pallet by two operators. Two operators are required because of the container weight (122 pounds). The motors are removed from the shipping container and placed in a rack located in an adjacent storage bay to awaiting firing. Because of the weight of the motor, two operators are required to move the motor to the firing stand. Operations in each of the firing bays are identical. While the rocket motors are removed from the containers and placed in the storage racks, the electronics technician checks the firing circuitry of each bay, public address system, siren and warning lights.

To start the firing cycle the two operators in each bay removes a motor from the storage rack in the surge bay and handcarries it to the firing stand. The motor is placed in the stand and clamped to prevent movement. Final circuitry checks are made and the firing leads are connected to the motor initiation circuit. The operators retire to the personnel shelter, close door, insert key into circuit and await the firing. The technician fires the motor in each bay sequentially. Upon receiving the ."all-clear", the operators return to the bay, remove the fired motor case and repeat the cycle until all motors are fired. Two pallets are fired in each firing bay each day, four days per week.

Working leaders - A Working leader is assigned to each bay to oversee the demil operation, check circuitry during firings and fill in during absences of a operator.

Operator - The fifth operator is assigned as a forklift operator to move pallets, fired motor cases and as a utility person.

The firing cycle and hours cited in paragraph 1 are based on previous small motor operations and experience gained during the recent INF and GAF firings.

Page 3

4.   <u>Miscellaneous Indirect Support</u>

The demil rate for the 5 inch motor will be much
greater than that of the Pershing (1,280 per month <u>vs</u>
26 per month).   Another consideration is the firing
circuit for the 5 inch motor.   Compared with the
Pershing firing circuit, the 5 inch firing circuit is
more complex.

As a result of the high rate and firing circuitry a
greater amount of indirect support will be required.

# ATTACHMENT H

John Hall, *Chairman*
Pam Reed, *Commissioner*
Peggy Garner, *Commissioner*
Anthony Grigsby, *Executive Director*



# TEXAS NATURAL RESOURCE CONSERVATION COMMISSION

*Protecting Texas by Reducing and Preventing Pollution*

June 22, 1994

Lieutenant Colonel Lawrence J. Sowa
Longhorn Army Ammunition Plant
Marshall, Texas  75671-1059

**Attn:  SMCLO-CO (Steve Flowers)**

Re:  Interim Status Modification Request to Demilitarize
     HVAR and Sparrow Rocket Motors
     Permit No. HW-50195
     Solid Waste Registration No. 30990

Dear Colonel Sowa:

This letter is in response to your letter dated May 16, 1994, which
updates your April 28, 1994 letter.  We agree to your request for
a public meeting on the interim status modification request.  You
should now arrange for a meeting hall which can be open to the
public for a specific evening and publish a notice of the time,
location and subject of the meeting at least 10 days in advance of
the meeting.  An example notice has previously been supplied to
Lynn Muckelrath.  The Commission will send a representative to the
meeting to explain the applicable regulations and procedures.  You
should have someone present to explain the proposed activity and
its potential impact on the environment.  The public will then be
allowed to ask questions and express concerns.

After the meeting, the Commission's representative will prepare a
summary of the meeting and the public's concerns.  The Commission's
staff will prepare a recommendation to the Executive Director to
approve or deny your interim status modification request, with a
justification for the recommendation which will be based in part on
the meeting report.  The Executive Director will send you a letter
indicating that he has approved or denied your request.

We will accept your submittal for May 16, 1994 as a revision to
your application for permitted status of your open detonation
units.

Lieutenant Colonel Lawrence J. Sowa
Page 2
June 22, 1994

Please inform me of the time and location of the meeting as soon as
it is scheduled. I can be contacted at (512)239-6626.

Sincerely,

Charles E. Mauk, Leader
Facility Team IV
Permits Section
Industrial and Hazardous Waste Division

CEM:rlb

cc: TNRCC Region 5 Office - Tyler

# ATTACHMENT I



PERMIT NO. <u>02713</u>
(corresponds to
NPDES PERMIT NO. <u>TX0000035</u>)

### TEXAS WATER COMMISSION
Stephen F. Austin State Office Building
1700 N. Congress Ave.
Austin, Texas  78711

This permit supercedes and
replaces Permit No. 02713,
approved February 21, 1992.

<u>PERMIT TO DISPOSE OF WASTES</u>
under provisions of Chapter 26
of the Texas Water Code

U.S. Department of the Army

whose mailing address is

P.O. Box 1149
Marshall, Texas 75671

is authorized to treat and dispose of wastes from the Longhorn Army Ammunition Plant (SIC 9711 and 3483)

located adjacent to Caddo Lake with the Town of Uncertain at the northern boundary and the Town of Karnack at the western boundary, Harrison County, Texas

to an unnamed tributary (locally known as North Bayou); thence to Goose Prairie; thence into Caddo Lake for Outfall 001; for Outfall 002, to a wetland; thence to Harrison Bayou; thence into Caddo Lake in Segment No. 0401 of the Cypress Creek Basin

only in accordance with effluent limitations, monitoring requirements and other conditions set forth herein, as well as the rules of the Texas Water Commission ("Commission"), the laws of the State of Texas, and other orders of the Commission. The issuance of this permit does not grant to the permittee the right to use private or public property for conveyance of wastewater along the herein described discharge route. This includes property belonging to but not limited to any individual, partnership, corporation or other entity. Neither does this permit authorize any invasion of personal rights nor any violation of federal, state, or local laws or regulations. It is the responsibility of the permittee to acquire property rights as may be necessary to use the herein described discharge route.

This permit and the authorization contained herein shall expire at midnight, five years after the date of Commission approval.

ISSUED DATE:  AUG 2 0 1993

ATTEST: _____     _____
                                        For the Commission

# EXHIBIT 2

# LONGHORN ARMY AMMUNITION PLANT
## TEXAS
EPA ID# TX6213820529

**EPA REGION 6**
**CONGRESSIONAL DISTRICT 01**
Harrison County
Karnack

**Updated: April 3, 2003**

## Site Description

**Location:**
- The site is located between State Highway 43 and Caddo Lake in Karnack, Harrison County, Texas, which is approximately 14 miles northeast of Marshall, Texas, and approximately 40 miles northwest of Shreveport, Louisiana.

**Population:**
- The site is in a rural area with some residences in close proximity.
- Approximately 1,500 people live within a one-mile radius of the site.

**Setting:**
- The site area is residential, recreational, and industrial.
- The facility is Government-owned (Federal Facility), and is currently under the jurisdiction of the U.S. Army Armaments, Munitions, & Chemical Command. The site is an 8,493-acre munitions loading and assembly facility that has operated since 1942.
- Five areas have observable releases to surface and ground water: an active burning ground (includes unlined evaporation pond), old landfill, inert burning grounds, south test area, and former TNT production area.
- 14 areas have been identified as contaminated or possibly contaminated with potential off-site migration.

**Hydrology:**
All surface and storm water from the plant drains into Caddo Lake via four natural drainage systems, and the entire site lies within the 100-year floodplain.
- The site lies on the Carrizo Sand and Wilcox Group formations, which are hydraulically interconnected and considered to be one aquifer.
- 75% of the wells in Harrison County are less than 50 feet deep and are screened in the Carrizo-Wilcox Aquifer.
- Area public supply wells (Karnack and Caddo Lake water supply systems) are also located in the Carrizo-Wilcox Aquifer and range from 200 to 300 feet in depth
- The nearest drinking water well is approximately 500 feet from the northern boundary of the plant, and serves as one of the seven Caddo Lake principal water supply wells.
- No alternate water supply is available for public water supply systems in the area.

EPA Publication Date:  April 3, 2003

## Wastes and Volumes

- The principal pollutants are methylene chloride, and trichloroethylene (TCE).

- Other contaminants include perchlorate, trinitrobenzene, dichloromethane and barium in ground water; dinitrotoluene, trinitrotoluene (TNT) in sediments and soil.

- The total volume of contaminated soil, sediments and water is unknown at this time.

## Site Assessment and Ranking

NPL LISTING HISTORY
Site HRS Score: 39.83
Proposed Date: 7/14/89
Final Date: 8/30/90
NPL Update: No. 9

## Site Map and Diagram



## The Remediation Process

Site History:

- The facility operated from 1942 to 1997, historically manufacturing TNT and rocket motors.
- Site operations included loading, assembling and packing pyrotechnic and signal ammunition, manufacturing solid propellant rocket motors, and rocket demilitarization pursuant to the INF treaty with the former Soviet Union; the facility is currently identified as being "excess"to the Army mission.
- The Remedial Investigation and Feasibility Study (RI/FS) was initiated in August 1982. Phase I RI activities completed in 1993-1994. Phase II RI activities were initiated and completed in 1995. Phase III RI activities are currently underway.
- All remedial activities are the responsibility of the U.S. Army, under EPA and Texas Natural Resource Conservation Commission oversight.

Health Considerations:

- Public water supply wells are located near site, and no alternate supplies are available in the event these wells become contaminated. Potential human exposure risks may include direct contact with, and ingestion of, contaminated ground water.
- Caddo Lake is the drinking water source for seven public drinking water supply systems downstream from Longhorn in the state of Louisiana. Surface water runoff from the site enters Caddo Lake.

## Records of Decision

> Interim Remedial Action ROD at BG3 May 12, 1995
> Interim Remedial Action ROD at Landfills September 27, 1995
> No Further Action ROD, Sites 13 & 14 February 14, 1996
> No Further Action ROD, Sites 1, 11, 27, and XX January 23, 1998

- The Interim Remedial Action ROD for Burning Ground No. 3 (BG3) selected interception and treatment of shallow contaminated ground water and excavation and treatment via low temperature thermal desorption of sludges and process waste.
- The Interim Remedial Action ROD for Landfills 12 and 16 selected construction of a multi-layer cap and cover system over the areal extent of the landfill contents.
- The No Further Action ROD for sites 13 (Suspected TNT Burial Site Dump) & 14 (Area 54 Burial Ground) (Collectively known as the Group 3 Sites) was selected after it was found that no chemicals associated with past suspected disposal activities at the sites were detected in either the soils or ground water.
- The No Further Action ROD for sites 1 (Inert Burning Grounds), 11 (Suspected TNT Burial Ground), 27 (South Test Area), and XX (Ground Signal Test Area) (Collectively known as the Group 1 Sites) was selected after it was determined that there are no actual or threatened releases of hazardous substances from the sites that may present an imminent and substantial endangerment to public health, welfare, or the environment.

---

## Community Involvement

- Proposed Plan and Public Meeting for Interim Remedial Action at Burning Ground No. 3: 9/94
- Proposed Plan and Public Meeting for Interim Remedial Action at Landfills: 3/95
- Proposed Plan and Public Meeting for No Action ROD for Group #3 Sites: 7/95
- Public Meeting to discuss formation of Restoration Advisory Board: 4/96
- Proposed Plan and Public Meeting for No Action ROD for Group #1 Sites: 8/97
- Public Meeting/Open House held at Karnack Community Center: 10/02
- Ongoing Quarterly Technical Review Committee meetings with the public are held at Longhorn.
- Site Repository:  City of Marshall Public Library and Karnack High School Library

## Technical Assistance Grant

- Letter of Intent (LOI):
       1) 7/06/00 - Caddo Lake Institute.
- LOI notice: 8/29/00
- Grant Award:  TAG awarded on 3/22/01 to Caddo Lake Institute
                          Rt. 2, Box 24B
                          Uncertain, TX  75661
                          903-789-3936
- Current Status:  Active TAG.  Two Technical Advisors selected.  Wilma Subra Co. and Henry Bradbury Environmental Solutions

## Contacts

- **Remedial Project Manager (EPA):** Chris Villarreal, 214-665-6758, Mail Code:  6SF-AP
- **EPA Region 6 Ombudsman:** Arnold Ondarza; 303-312-6777
- **State Contact:**  (TNRCC) James Sher, 512/239-2444, Mail Code: 143
- **Attorney (EPA):**  Michael C. Barra, 214-665-2143, Mail Code:  6SF-RC-S
- **State Coordinator (EPA):** Karen Bond, 214-665-6682, Mail Code:  6SF-AP

## Enforcement

- The State of Texas, EPA and Department of Defense-U.S. Army Longhorn Army entered into a Federal Facility Agreement in December 1991 to address the contamination at the facility.

## Present Status and Issues

- Longhorn Army Ammunition Plant site currently does not present an immediate threat to the public or the environment.
- As studies are completed and viable cleanup alternatives are determined for the sites, final remedies will be selected, and the cleanup activities will begin.
- Construction activities relating to the Interim Remedial Action ROD for Burning Ground No. 3 have been completed. The ground water treatment plant was completed in 12/96 and soil

treatment unit was completed in 2/97. Treatment of contaminated soils from Burning Ground No. 3 was completed December 1997. Ground water interception collection trenches have been constructed in and around Burning Ground No. 3 and extraction and treatment of extracted contaminated shallow ground water began in April 1998.
- Construction activities related to the Interim Remedial Action ROD at landfills 12 and 16 are complete. Final construction inspections for landfills 12 and 16 occurred on October 22, 1998.

- Expedited remedial investigation activities are underway at Site 16. Specifically, the extent of a contaminated ground water plume coming from landfill 16 has been investigated and possible remedial alternatives are being evaluated to address this ground water plume. The contaminated ground water from Landfill 16 is currently being hydraulically contained. The extracted ground water is being pumped and piped to the BG3 water treatment plant. The Site 16 Remedial Investigation Report was submitted in October 2000. The draft final Feasibility Study for the Group 2 Sites which include Site 16 was submitted for EPA and TNRCC review in May 2002.
- Phase III remedial investigation field activities for the Group 2 Sites (Site 12 - Active Landfill, Site 16 - Old Landfill, Site 17 - Burning Ground #2, Site 18 - Burning Ground #3, Site 24 - Unlined Evaporation Pond, Site 29 - Former TNT Production Area, and Site 32 - Former TNT Waste Disposal Plant) are completed.
- The Phase III remedial investigation field activities for the Group 4 sites (Wastewater Sumps, Site 50 - Sump Water Storage Tank, and Site 63 - Former Burial Pits) have been completed.
- Numerous activities are underway at Longhorn regarding perchlorate. Perchlorate was used at Longhorn as a major ingredient in rocket fuels. Activities include: 1) a facility wide investigation to determine the extent of perchlorate contamination; 2) a bench scale study focused on removing perchlorate from groundwater, and, 3) a perchlorate ecological investigation being conducted by Texas Tech University. A treatment unit was added to the existing ground water treatment plant to remove perchlorate. The treatment unit (i.e., a fluidized bed reactor) has been fully operational since March 7, 2001.
- On October 21, 2000, a ceremony was held designating Longhorn as the Caddo Lake National Wildlife Refuge. An overlay and subsequent transfer of the Longhorn property to the Department of Interior, Fish and Wildlife Service will take place as areas are designated appropriate for inclusion into the wildlife refuge.

## Benefits

- The major production areas of Longhorn are currently being investigated pursuant to the Federal Facilities Agreement.
- Sensitive ecosystems will be protected including Caddo Lake against contamination from the facility. Caddo Lake is a primary source for drinking water for several surrounding communities as well as a location for recreational activities (i.e., fishing).

# EXHIBIT 3

# CIVIL DOCKE

S/M Inc., Dallas 1-800-648-7022

| NUMBER OF CASE | STYLE OF CASE | ORDERS OF COURT | ATTO |
|---|---|---|---|
| 0300108 | John Ament, et al. | | Jahn P. |
| | vs. | | |
| | American Electric | | |
| | Power Co., et al | | |

**FEE BOOK**

| Vol. | Page |
|---|---|

**DATE OF ORDERS**

| Mo. | Day | Year |
|---|---|---|

DISTRICT

By

FILED FOR RECORD

JUN 23 A 10: 11

JANIE McCAY
DISTRICT CLERK
MARION COUNTY, TEXAS
BY_____DEP.

## CAUSE NO. 0300108

| | |
|---|---|
| JOHN AMENT ET AL, | IN THE DISTRICT COURT OF |
| Plaintiffs | |
| v. | |
| AMERICAN ELECTRIC POWER COMPANY, INC. (AEP), ET AL, | |
| Defendants. | MARION COUNTY, TEXAS 115th JUDICIAL DISTRICT |

## <u>RULE 11 NOTICE OF AGREEMENT TO EXTEND DATE TO RESPOND TO ORIGINAL PETITION</u>

Defendants ATK Aerospace Company, Inc. and Alliant Techsystems, Inc. hereby advise the court of the parties' agreement extending the date to July 14, 2003, by which the Alliant, ATK and related parties named in Plaintiffs' Original Petition are required to answer or otherwise respond to said Petition. A copy of the correspondence between counsel confirming the extension is attached hereto.

Dated: June 20, 2003

Respectfully submitted,

MICHAEL L. LARSEN
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT 84145-0898

ATTORNEYS FOR ATK AEROSPACE COMPANY, INC. AND ALLIANT TECHSYSTEMS, INC.

537169.1

## CERTIFICATE OF SERVICE

I hereby certify that on this **20** day of June, 2003, I caused to be mailed, first class, postage prepaid, a true and correct copy of the foregoing RULE 11 AGREEMENT TO EXTEND DATE TO RESPOND TO ORIGINAL PETITION, to:

John D. Sloan, Jr.
Laureen F. Bagley
Sloan & Monsour, P.C.
101 E. Whaley Street
Longview, TX 75601

Mark R. Mueller
Kathleen P. McCartan
Mueller Law Offices
404 West 7th Street
Austin, TX 78701

A CERTIFIED COPY
ATTEST: JANIE McCAY
DISTRICT CLERK, MARION COUNTY, TEXAS
June 30 2003
BY Wynetta Brown
DEPUTY

FILED FOR RECORD

2003 MAY 29  P 4: 43

JANIE McCAY
DISTRICT CLERK
MARION COUNTY, TEXAS

CAUSE NO. 0300108

| | | |
|---|---|---|
| JOHN AMENT  ET AL, | § | IN THE DISTRICT COURT OF————DEP. |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| VS. | § | MARION COUNTY, TEXAS |
| AMERICAN ELECTRIC POWER | | _____ JUDICIAL DISTRICT |
| COMPANY, INC. (AEP), ET AL, | | |
| | | |
| DEFENDANTS | | |

### PLAINTIFFS' ORIGINAL PETITION, REQUEST FOR PERMANENT INJUNCTION & REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF THE COURT:

Plaintiffs, **JOHN AMENT, DON AND ANN HOWELL, CHUCK AYERS,, GARY KEMPF, INDIVIDUALLY AND D/B/A CRIPPS CAMP, HENRY LEWIS AND MARY D. LEWIS, RICHARD MCFARLAND, INDIVIDUALLY AND D/B/A  JOHNSONS RANCH, STEVEN PARKER, MICHAEL WAYNE WOODFIN, INDIVIDUALLY AND D/B/A BAYOU LANDING RESTAURANT,** file their Original Petition, Request for Permanent Injunction and Request for Disclosure.  All allegations in the petition are incorporated into each count as if fully set forth in each.

#### A.  Parties

1.      Plaintiffs are individuals who are citizens of the State of Texas. .  Plaintiffs, John Ament,  Don and Ann Howell are residents of Marion County, Texas. Plaintiffs Chuck Ayers; Gary Kempf, individually and d/b/a Cripps Camp; Henry Lewis and Mary D. Lewis; Richard McFarland, individually and d/b/a Johnsons Ranch; Steven Parker, Michael Wayne Woodfin, individually and

1

d/b/a Bayou Landing Restaurant are residents of Harrison County, Texas

2.      All defendants named in this suit have done and are doing business in the State of Texas. The defendants are as follows:

A.      Defendant, AMERICAN ELECTRIC POWER CO. INC. (AEP), is a New York Corporation doing business in the State of Texas. Defendant, American Electric Power Company, Inc. (AEP) has at all times relevant to this litigation conducted business in this State and is required to designate a registered agent for service of process. It has not designated an agent for service of process here. Therefore this corporation may be served with process at its corporate headquarters and by serving D. Michael Miller, 1 Riverside, 29th Floor, Columbus, Ohio, 43215-2373, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§17.044(a)(1), (b), 17.045. **Plaintiffs seek service on this defendant by and through the Texas Secretary of State. Plaintiffs respectfully request that the District Court issue One (1) Citation as follows to the Secretary of State and serve by certified mail:**

**Gwen Shea, Texas Secretary of State**
**P.O. Box 12887**
**Austin, Texas 78711-2887**

B.      Defendant, AMERICAN ELECTRIC POWER SERVICE CORPORATION, a/k/a AEP Service Corporation, is a New York corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Dallas, TX 75201. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

C.      Defendant, SOUTHWESTERN ELECTRIC POWER COMPANY, (SWEPCO), a subsidiary of American Electric Power Company, Inc. (AEP), f/k/a Southwestern Gas And Electric Company, and a/k/a AEP Southwestern Electric Power Company and AEP/SWEPCO, is a Delaware Corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation

2

System, 350 N. St. Paul St., Dallas, TX 75201. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

D.    Defendant, CENTRAL AND SOUTHWEST SERVICES, L.P. f/k/a Southwest Services, Inc., n/k/a American Electric Power Company, Inc. (AEP), is a New York Corporation doing business in the State of Texas. Defendant, American Electric Power Company, Inc. (AEP) has at all times relevant to this litigation conducted business in this State and is required to designate a registered agent for service of process. It has not designated an agent for service of process here. Therefore this corporation may be served with process at its corporate headquarters and by serving D. Michael Miller, 1 Riverside, 29th Floor, Columbus, Ohio, 43215-2373, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§17.044(a)(1), (b), 17.045. **Plaintiffs seek service on this defendant by and through the Texas Secretary of State. Plaintiffs respectfully request that the District Court issue One (1) Citation as follows to the Secretary of State and serve by certified mail:**

**Gwen Shea, Texas Secretary of State**
**P.O. Box 12887**
**Austin, Texas 78711-2887**

E.    Defendant, CENTRAL AND SOUTHWEST SERVICES, L.P. is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation System, 350 North St. Paul St., Suite 2900, Dallas, TX 75201. **Plaintiffs request that the Clerk issue Citation at this time as to this Defendant and serve by Certified Mail.**

F.    Defendant, AEP TEXAS CENTRAL COMPANY, a/k/a AEP Central Power and Light Company, AEP CP&L, AEP, AEP Energy and American Electric Power, is an Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Dallas, TX

3

75201.  **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

G.    Defendant, CENTRAL AND SOUTHWEST CORPORATION, a subsidiary of Dolet Hills Lignite, LLC, is a Delaware Corporation doing business in the State of Texas and may be served by serving its registered agent Michael D. Smith, President, P.O. Box 660164, Dallas, Texas 75266-0614. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

H.    Defendant, DOLET HILLS LIGNITE, CO., d/b/a CLECO Corp. is a Louisiana Corporation doing business in the State of Texas. is required to designate a registered agent for service of process.  It has not designated an agent for service of process here. Therefore this corporation may be served with process at its corporate headquarters at 407 Polk St., Mansfield Louisiana, 71052, a **Plaintiffs seek service on this defendant by and through the Texas Secretary of State.  Plaintiffs respectfully request that the District Court issue One (1) Citation as follows to the Secretary of State and serve by certified mail:**

**Gwen Shea, Texas Secretary of State**
**P.O. Box 12887**
**Austin, Texas 78711-2887**

I..    Defendant, TEXAS UTILITIES GENERATING COMPANY, INC., is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, Peter B. Tinkham, President, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas 75201-3411.  **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

J.    Defendant, TEXAS GENERATION COMPANY, LP, A/K/A TXU ENERGY, AND TXU ENERGY - PRODUCTION, is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, Dallas, Texas 75201-

4

3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

K.      Defendant, TXU US HOLDING COMPANY F/K/A TXU ELECTRIC COMPANY, AND TEXAS UTILITIES ELECTRIC COMPANY, is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

L.      Defendant, TXU GENERATION MANAGEMENT COMPANY, LLC, is a Delaware Limited Liability Corporation doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

M.      Defendant, TXU CORP., f/k/a TXB, Inc., TUC Holding Company, and Texas Utilities Company, and a/k/a TXU Corporation and Texas Utilities, is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, Peter B. Tinkham, President, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

N.      Defendant, TXU MINING COMPANY, a/k/a Industrial Generating Co., TU Mining, TUMCO, TXU Mining Company, is a Texas Corporation, doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas, 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

O.      Defendant, TXU BUSINESS SERVICES COMPANY, a/k/a TU Services, Texas Utilities Shareholder Services, TXU Business Services, TXU Services, TU

5

Services, TXU Corporate Security, Texas Utilities Corporate Security, and Texas Utilities Services, Inc., is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, Peter B. Tinkham, President, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

P.      Defendant, TXU Mining Company, LP, a/k/a TXU Mining Company, LLC, is a Texas Corporation doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

Q.      Defendant, TXU SEM COMPANY, a/k/a TXU Energy Services, and TXU SEM, and f/k/a Texas Utilities SEM, Inc., is a Delaware Corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation System, 350 No. St. Paul St., Dallas, Texas 75201. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

R.      Defendant, TXU Mining Management Company, LLC, a/k/a TXU Energy and TXU Energy, Mining, is a Delaware Corporation doing business in the State of Texas and may be served by serving its registered agent, TXU Business Services Company, 1601 Bryan St., Energy Plaza, 43rd. Floor, Dallas, Texas 75201-3411. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

S.      Defendant, ATK AEROSPACE COMPANY, INC., F/K/A THIOKOL CORPORATION, MORTON THIOKOL, INC., THIOKOL PROPULSION CORPORATION, MORTON-NORWICH PRODUCTS, INC. AND CORDANT TECHNOLOGIES, INC., is a Delaware Corporation doing business in the State of

6

Texas and may be served by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Dallas, TX 75201. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

T.    Defendant, ALLIANT TECHSYSTEMS, INC. dba Metrum Instrumentation Services, and Metrum Information Storage, a/d/b/a ATK Composites, is a Delaware Corporation doing business in the State of Texas and may be served by serving its registered agent, CT Corporation System, 350 N. St. Paul St., Dallas, TX 75201. **Plaintiffs request that the Clerk issue citation at this time as to this defendant and serve by certified mail.**

U.    Defendants, JOHN DOE 1 through 100. Plaintiffs, in the exercise of due diligence, has not been able to determine the names and addresses of John Doe 1 through John Doe 100, inclusive.

3.    Defendants A through H are sometimes referred to collectively in this petition as "AEP" or the "AEP defendants." The AEP defendants own and operate H.W. Pirkey Power Plant ("Pirkey") in Hallsville, Harrison County, Texas, and Welsh Power Plant ("Welsh") in Pittsburg, Titus County, Texas.

4.    Defendants I through R are sometimes referred to collectively in this petition as "TXU" or the "TXU defendants." The TXU defendants own and operate Monticello Steam Electric Station ("Monticello") located in Titus County, Texas and the Martin Lake Steam Electric Generating Station ("Martin Lake") located in Rusk County, Texas.

5.    Defendants S through T are sometimes referred to collectively in this petition as "Morton Thiokol" or "Morton Thiokol defendants." The Morton Thiokol defendants operated a rocket motor production facility at Longhorn Army Ammunition Plant located northeast of Marshall in Harrison County, Texas.

### B. Control Plan

6.    Plaintiffs state their intent that discovery in this matter be conducted under Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

7

### C. Jurisdiction

7.     The Court has jurisdiction because the defendants are Texas residents or do business in the State of Texas and the damages sought are within the jurisdictional limits of the Court.

### D. Venue

8.     Venue is proper in Marion County, Texas. Specifically, venue is allowed in this county because all or a substantial part of the events or omissions occurred in this county. Tex. Civ. Prac. & Rem. Code §15.002(a)(1).

### E. Statement of the Case

9.     This is a suit for damages and injunctive relief arising out of the emission and/or discharge of mercury and other hazardous pollutants into the air, soil and water in and around Caddo Lake northeast of Marshall in Harrison and Marion counties Texas. The plaintiffs are adversely affected by the discharge of hundreds and thousands of pounds of toxic mercury from coal-fired power plants owned and operated by the AEP and TXU defendants and from the production of plastic explosives at Longhorn Army Ammunition Plant by the Morton Thiokol defendants. The plaintiffs are Texas citizens with an interest in Caddo Lake and its surroundings and are residents; owners and/or occupants of lakefront property and lakefront businesses; fishermen and guides and possessors of riparian or beneficial rights in Lake Caddo. Plaintiffs have been living and/or doing business in the Caddo Lake area and are dependent on the health of the lake and its resources for their livelihoods. Plaintiffs allege that defendants' contamination of the soil, water, fish, flora and fauna in and around Caddo Lake threaten their livelihood and their health.

### F. Factual Background

10.     Caddo Lake is an approximately 30,000-acre body of water -- the only naturally formed lake in Texas. It is located on Big Cypress Bayou on the Texas-Louisiana state line, northeast of Marshall in Harrison and Marion Counties in Texas. Caddo Lake combines scenic beauty with great biological diversity. It has been recognized by the Ramsar Convention as a

8

wetland of international importance providing a vital habitat for a great variety of vegetation, animal species and a host of diverse native freshwater fish. Caddo Lake is a well-known attraction for fishermen and hunters. Some fishermen and residents depend upon Caddo Lake for their livelihood and as a source of food. Tourists throughout the state and the nation come to Caddo Lake to camp, hike, swim, boat, fish, picnic, take photographs and study nature.

11.     AEP is the owner and operator of H.W. Pirkey Power Plant ("Pirkey") in Hallsville, Harrison County, Texas, a lignite-fired generating plant, and Welsh Power Plant ("Welsh") in Pittsburg, Titus County, Texas, a coal-fired power plant.

12.     TXU is the owner and operator of the Monticello Steam Electric Station ("Monticello"), a three unit lignite fueled power plant, located in Titus County, Texas and the Martin Lake Steam Electric Generating Station ("Martin Lake"), the largest lignite-fired generating plant in the world, located on the border of Rusk County in Texas.

13.     Morton Thiokol operated, beginning in 1955, a rocket motor production facility at Longhorn Army Ammunition Plant located northeast of Marshall, Texas in Harrison County. Wastes from production facilities on the site were washed into ponds or buried in landfill. Operations were suspended on or about August of 1997.

14.     This lawsuit arises out of damages caused by emissions and releases of mercury and other contaminants into the air, water, and soil from facilities owned and operated by the defendants. Monticello, Martin Lake, Pirkey and Welsh power plants are the single largest sources of mercury stack emissions in northeast Texas. The waste disposal activities of the Morton Thiokol defendants at the Longhorn facility contaminated the water and caused contamination of groundwater wells and further migration of mercury into the lake.

15.     The effect of the emissions or releases from these plants severely impact the ecosystem of Caddo Lake and, consequently, is an unreasonable interference with the plaintiffs' interest in the use and enjoyment of his or her property and/or property rights that causes material and substantial harm to the plaintiffs. The defendants, rather than conducting their operations with utmost care because of their proximity to Caddo Lake, its wetlands and lakeshores, have

9

released hundreds and thousands of pounds of mercury and other toxins and contaminates and pollutants into the environment. Mercury particles emitted into the air from the defendants' coal-burning plants are deposited onto the areas around Caddo Lake and into Caddo Lake and have contaminated the lake and its environs with toxic mercury as well as endangered the health of the community.

16.     Mercury from the defendants facilities enters or migrates into Caddo Lake from the air, storm water runoff or ground water flow and accumulates and moves up the food chain in increasing amounts -- from small fish to larger predatory fish to humans.   The confirmed presence of mercury in largemouth bass and freshwater drum in Caddo Lake has deprived the plaintiffs of the enjoyment and use of their property and is in utter and total disregard for their health and safety. The Texas Department of Health has issued a restricted consumption advisory for Caddo Lake for the general population, children, and women of childbearing age due to elevated levels of mercury found in the tissue of largemouth bass and freshwater drum.

17.     At all relevant times, the power-plant defendants knew of the emission of large concentrations of mercury into the environment from their facilities. Defendant Morton Thiokol was aware of the discharge of mercury into nearby ponds and landfills. Defendants also knew that these emissions and/or discharges were a threat to human health, property and the environment. The defendants knew, or in the exercise of ordinary care, should have known of the toxic effect of mercury, yet the defendants intentionally withheld and/or failed to disclose to the plaintiffs the related dangers and the ultimate threat to Caddo Lake and those who lived, worked and played near the lake.  As a result of each defendant's conduct and/or omissions, each plaintiff's property has been damaged or will be damaged as is more fully set forth in the causes of action pled in this petition.

10

### G. Respondeat Superior

18.     At all times relevant to this action, all agents, partners, officers, servants, assigns, successors and/or employees of the defendants were acting within the course and scope of their employment for the respective defendants and these defendants have ratified such conduct and omissions, expressly or impliedly, and have retained the benefits of the transaction and are liable for such conduct and omissions pursuant to the doctrine of *respondeat superior*.

### H. Discovery Rule

19.     Plaintiffs affirmatively plead the discovery rule as that legal principal is applied and understood under the laws of the State of Texas. Plaintiffs further plead that all causes of action are timely pled in that the plaintiffs filed suit within the requisite time that the plaintiffs knew (or reasonably should have known) that their damages were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

20.     Plaintiffs cannot be denied the right to assert well-established common law causes of action pursuant to the Texas Constitution, Article I, Section 13 which provides that all courts shall be open to every person for an injury done to him in his lands, goods, person or reputation. In response to any claim by any of the defendants that any of the plaintiffs' causes of actions are barred by limitations, the plaintiffs therefore invoke the "open courts" provision of the Texas Constitution in response to any claim by the defendants that the plaintiffs' causes of action are barred by the statute of limitation.

21.   Plaintiffs assert that the defendants are estopped from invoking limitations as a defense because the defendants have, knowingly or recklessly, misrepresented material facts and/or fraudulently concealed their negligence and wrongful acts and omissions from the plaintiffs knowing that the plaintiffs had no knowledge of the real facts. These representations and/or the deliberate concealment of a right of action which belonged to the plaintiffs were effected with actual or constructive knowledge on the part of the defendants and for the purpose of inducing the plaintiffs to act or to refrain from action in reliance upon them--which the plaintiffs did, to their detriment.

11

## I. Count 1 -- Negligence Per Se

22.     Defendants conduct was negligence per se because the defendants breached a duty imposed by statute. The plaintiffs are within the class of person these laws were designed to protect. Defendants' acts or omissions in violation of these statutes are the proximate cause of the plaintiffs' injuries and damages. Specifically, defendants breached the duty imposed by the Texas Clean Air Act in that defendants' continued releases of mercury and other air contaminants has caused or contributed to air pollution and threaten to continually pollute and contaminate the air.

23.     Defendants have failed to protect the public health, welfare, and the environment in conducting operations and activities at their facilities. Their violation of state law is negligence per se. As a direct result of the defendants' continuing actions and omissions, plaintiffs have suffered damages.

## J. Count 2 -- Negligence And Gross Negligence

24.     AEP, TXU and Morton Thiokol have negligently caused exposure to and contamination by mercury and other toxic substances. The defendants had a duty to use reasonable care in the conduct of their operations in order to avoid injury to persons and property. Each defendant knew, or in the exercise of reasonable care should have known, that at all relevant times the discharge of mercury and other contaminates from their facilities exposed the plaintiffs to a foreseeable risk of harm. Nevertheless, the defendants failed to warn any plaintiff of the hazards caused by the discharge of mercury and other contaminates into the environment and ultimately into Caddo Lake and the resultant harm to its ecosystem and to the property and livelihood of the plaintiffs.

25.     The defendants knew, or through the exercise of ordinary care should have known, of the availability of pollution control technologies that would reduce emissions and discharges from their operating facilities. Not only did each defendant fail to implement such controls, but each continued operations with inadequate pollution control measures despite knowledge of the inevitable harm to the plaintiffs' property. Such negligent and reckless delay and/or refusal to put reasonable pollution controls into operation is a breach of the duty of care owned to each plaintiff.

12

26.     Plaintiffs have sustained and will sustain damages as a direct and proximate result of these negligent acts. Further, the defendants' conduct, given the magnitude and the probability of the potential injury to the affected community, created an extreme degree of risk and high likelihood of serious injury to the plaintiffs and plaintiffs' properties and rights.  Moreover, given their access to superior data, internal information and technological expertise, defendants had actual, subjective awareness of the risks involved and chose to proceed with their activities.  This conduct is indicative of the companies conscious indifference to the rights, safety and welfare of the plaintiffs and, as a result, the plaintiffs are entitled to punitive as well as actual damages.

13

## K.  Count 3 -- Public Nuisance

27.  The defendants are liable to the plaintiffs for the creation of a public nuisance because their actions have significantly interfered with public rights, involve actions forbidden by law, and are continuing in effect.

28.  The conduct of the defendants has had a substantial injurious effect on the plaintiffs' properties, welfare, and comfort and is the proximate cause of their special damage. The defendants are, therefore, accountable in law for the creation of a present and continuing public nuisance.

29.  The defendants' acts and failures to act in the operation of their facilities result in the maintenance of a continuing source of pollution for which the defendants have refused to accept responsibility.  The defendants have created, maintained and refused to abate a public nuisance, contrary to the laws of the State of Texas. The defendants have willfully and intentionally damaged and continue to damage the plaintiffs and their property.

30.  As the direct and proximate result of the contamination of the plaintiffs' property and the pollution of the air and water of the State of Texas, the plaintiffs have endured a continuing nuisance. The nature and extent of the contamination of the plaintiffs' property is such that the nuisance must and can be abated by the defendants at a reasonable cost and by the technology currently available to them.  Plaintiffs request that the nuisance be removed, remediated and/or abated. The plaintiffs further request damages for injuries and losses sustained, including, but not limited to, discomfort, annoyance, inconvenience, and harm to property.

14

### L. Count 4 -- Private Nuisance

31.    The defendants voluntarily, intentionally, or negligently invaded the private use and enjoyment of the plaintiffs' private property interests and with their enjoyment of public properties in the affected area. Such conduct     constitutes a private nuisance. The defendants knew with a reasonable degree of certainty, or in the exercise of ordinary care should have known, that the failure to take reasonable and timely measures to abate pollution would cause substantial annoyance to persons of ordinary sensibilities residing in the vicinity, as well as the depreciation in the market value of the surrounding property.

32.    Defendants breached their duty to the plaintiffs and, as a result, proximately caused the interference with the use and enjoyment of the plaintiffs' property and the injuries and damages for which they now sue.   The pollution of the soil, air, and water causes invasive harm and constitutes a present and continuing nuisance.   Such nuisance was a legal or contributing cause of the plaintiffs' damages and injury to their properties.

### M. Count 5 -- Trespass

33.    Defendants have trespassed by causing airborne particulates and/or contaminated water-containing mercury to physically enter plaintiffs' land, and the air, water and soil in and around Caddo Lake and ultimately into its fragile ecosystem. Such trespass by the defendants is an encroachment upon the rights of plaintiffs who are riparian or beneficial owners and who are entitled to reasonable use of the Lake appurtenant to their land.   Such trespass is an interference with business owners and professional fishermen and guides, whose business profits are or will be diminished by pollution of the Lake and poisoning of the fish. The mercury entered and remains upon the soil land and in the water as a result of the defendants intentional acts. Plaintiffs have no adequate remedy at law to prevent such encroachment and trespasses on plaintiffs' property and rights by defendants. Unless abated by injunctive relief, the pollution of the soil, water and/or air will continue.

15

34.     Such trespasses are a proximate cause of the injuries and damages alleged in this petition for which the plaintiffs sue. The defendants' conduct entitles the plaintiffs to actual and exemplary damages.

### N. Count 6 -- Ultra Hazardous Activities

35.     The operations of AEP, TXU and Morton Thiokol constitute "ultra hazardous activities" for which they should be strictly liable since their noxious and deadly fumes have escaped their facilities and invaded the plaintiffs' property and interfered with their rights in and to property.

### O. Count 7 -- Eighth Claim - Res Ipsa Loquitor

36.     Plaintiffs further allege that in operating the facilities, and in use of their property, the defendants maintained exclusive management and control over large quantities of toxic pollutants/contaminants that would not ordinarily been released had defendants exercised reasonable care.

### P. Damages

37.     As a direct and proximate result of the acts and omissions of the defendants individually and severally, the plaintiffs have suffered exposure to toxic pollutants and pray that they recover damages including, but not limited to the following:

    a.    reasonable compensatory damages for loss in value and marketability of property and property interests;

    b.    reasonable compensatory damages for the costs of medical testing, monitoring, treatment and prevention that will be required in the future as a proximate result of defendants' pollution;

    c.    reasonable damages for nuisance, trespass, mental anguish, fear of adverse health consequences, inconvenience, loss of use or enjoyment, discomfort, restrictions on activities, loss of business opportunities and other disturbances of the lives of the plaintiffs caused by the defendants' pollution;

    d.    appropriate counsel fees and expenses incurred in connection with the litigation of this matter;

    e.    exemplary damages; and

    f.    such other damages as are just.

38.     The wrongful contamination in and around Caddo Lake has caused irreparable injury to the plaintiffs and will continue to do so as long as the defendants pollute Caddo Lake and its environs.

39.     No adequate remedy at law exists to adequately compensate plaintiffs for the injuries that will be caused to them in the future unless the defendants are ordered to abate the nuisances and stop the trespass of toxic mercury into the air, water and soil in and around Caddo Lake.

40.     Plaintiffs, therefore, are entitled to and request this court to enjoin the defendants from causing any further contamination of their properties and to eliminate any nuisance or trespass caused by the presence of mercury in the air, water and soil. Specifically, if a jury finds contamination and/or pollution of the air or water or soil and the finding demonstrates that it results from the defendants' operations and activities, plaintiffs ask for injunctive relief reasonably tailored to redress irreparable harms that include, but are not limited to:

    a.    orders designed to abate all nuisances to plaintiffs posed by defendants' actions and omissions;

    b.    orders designed to require that the defendants conduct future operations at their facilities in a manner that eliminates all unreasonable risks to the plaintiffs;

    c.    orders requiring defendants to provide appropriate medical monitoring to the population subjected to increased risks as a result of defendants' emissions; and

    d.    orders requiring defendants to implement the best available pollution control technology reasonable designed to reduce risks to the plaintiffs.

41.     Plaintiffs reserve the right to amend and/or supplement further with respect to the damages claimed in this lawsuit.

## Q. Demand for Jury Trial

42.     Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

17

### R. Request for Disclosure

40.     Under Texas Rule of Civil Procedure 194, the plaintiffs request that defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

### R. Prayer

43.     For these reasons, plaintiffs ask that the defendants be cited to appear and answer and, on final trial, that plaintiffs have:

a.     Permanent injunction.

b.     Actual damages.

c.     Special damages as pled in this petition

d.     Prejudgment and postjudgment interest.

e.     Costs of suit.

f.     Attorney fees.

g.     All other relief, in law and in equity, to which plaintiffs may be entitled.

Respectfully submitted,

SLOAN & MONSOUR, P.C.
101 East Whaley Street
Longview, Texas 75601
Telephone: (903) 757-7000
Fax: (903) 757-7574

By: _____

John D. Sloan, Jr., SBT No. 18505100
Laureen F. Bagley, SBT No. 2401052

18

e.    Costs of suit.

f.    Attorney fees.

g.    All other relief, in law and in equity, to which plaintiffs may be entitled.

Respectfully submitted,

SLOAN & MONSOUR, P.C.
101 East Whaley Street
Longview, Texas 75601
Telephone: (903) 757-7000

By:_____

John D. Sloan, Jr., SBT No. 18505100
Laureen F. Bagley, SBT No. 24010522

MUELLER LAW OFFICES
404 West 7th Street
Austin, Texas 78701
Telephone: (512) 478-1236
Fax: (512) 478-1473

By:_____

Mark R. Mueller, SBT No. 14623500
Kathleen P. McCartan SBT No. 03783450

ATTORNEYS FOR PLAINTIFFS

20

A CERTIFIED COPY
ATTEST: JANIE McCAY
DISTRICT CLERK, MARION COUNTY, TEXAS
June 30          20 03
BY  Wynetta Brown
DEPUTY